660 So.2d 32 (1995)
John YOUNG
v.
Otis T. LOGUE, et al.
No. 94-CA-0585.
Court of Appeal of Louisiana, Fourth Circuit.
May 16, 1995.
Rehearing Denied September 26, 1995.
*36 Craig R. Nelson, Christina P. Fay, Hulse, Nelson & Wanek, New Orleans, for defendant, appellant Clemco Industries Corp.
Janet L. MacDonell, Deutsch, Kerrigan & Stiles, New Orleans, for defendant, appellant E.D. Bullard Co.
Joseph M. Bruno, Natasha R. Zimmerman, Bruno & Bruno, New Orleans, for plaintiff, appellee John Young.
*37 Before BARRY, ARMSTRONG and PLOTKIN, JJ.
PLOTKIN, Judge.
In this case, plaintiff, John Young, asserts that he contracted silicosis due to the defective nature of protective airhoods manufactured and/or sold by certain named defendants. The jury found in Young's favor and awarded him $1,500,000 in damages. Based on our review of the record, we affirm in part, reverse in part, and render judgment.

FACTS

Procedural History
John Young was employed by Land and Marine Applicators/Coastal Coatings ("L & M")[1] as a sandblaster from 1967 until 1980. On August 3, 1981, he brought suit against John M. "Red" Loerwald, the owner of L & M, certain executive officers of L & M, including Otis Logue and Manfred Nicklas, and certain sandblasting equipment manufacturers, including Pulmosan Safety Equipment Corp. ("Pulmosan") and Minnesota Mining & Manufacturing Co. ("3M"), alleging that each played a role in the development of his silicosis. In July of 1984, Young filed a Supplemental and Amending Petition for Damages that added, inter alia, Clemco Industries Corp. ("Clemco") and E.D. Bullard Company ("Bullard") as additional defendants, alleging that they manufactured and/or distributed defective sandblasting masks and hoods that Young used while employed at L & M. Pursuant to a Fifth Supplemental and Amended Petition for Damages filed in March of 1990, Young added Pauli & Griffin Company, Inc. ("Pauli & Griffin") as a defendant, alleging that it manufactured defective sandblasting masks, hoods, and other respiratory protection equipment Young used while employed at L & M.
Prior to trial, Young settled his claims against all defendants except Clemco, Bullard, and Pauli & Griffin. The matter proceeded to trial before Hon. Preston H. Hufft, Judge Ad Hoc, in July of 1993. At trial, over Clemco's objection, Young dismissed his claim against Pauli & Griffin after the parties reached a "Mary Carter"[2] settlement. The jury returned a verdict against Clemco, Bullard, and Loerwald, finding them liable for Young's injury and awarding Young $1,500,000 in damages. The trial court reduced this by 1/3 to $1,000,000, representing Loerwald's virile share as a dismissed defendant.[3] Clemco and Bullard appealed suspensively to this Court after the trial court denied their various post-trial motions.

Sandblasting and Silicosis
Before turning to the specifics of this litigation, we pause briefly to explain what is *38 meant by "sandblasting." Generally speaking, sandblasting refers to the process of cleaning and scoring metal surfaces by spraying the surface with sand propelled at high pressure by compressed air. When the sand particles impact the metal surface, they tend to fracture into smaller pieces. Normally, these particles are large enough that they either are trapped by the mucus membranes and are expectorated or they are engulfed in the lung by alveolar macrophobes that move the particles "back into the bronchioles where they are eliminated via the mucocilliary action of the bronchus." 4A Roscoe N. Gray & Louise J. Gordy, Attorneys' Textbook of Medicine 205A-7 to 205A-8 (3d ed. 1993). However, some of these pieces are invisible to the naked eye and are so small as to become respirable (i.e., they can be inhaled directly into one's lungs). Excessive exposure to these ultra-fine particles can lead to the respiratory disease silicosis.
Technically, sandblasting is a specific form of "abrasive blasting." Used properly, the term "abrasive blasting" denotes blasting operations in which the abrasive is anything other than silica sand, such as steel shot, Black Beauty (a coal derivative), or walnut shells. However, "sandblasting" is sometimes used in a more generic sense to refer to any form of abrasive blasting without regard to the specific abrasive being used.
According to one article admitted into evidence at trial, "[s]andblasting was introduced into industry in 1904 and is widely used in shipbuilding, oil rig and platform manufacture and maintenance and in other metal industries." Behzad Samimi et al., The Efficiency of Protective Hoods Used by Sandblasters to Reduce Silica Dust Exposure, 36 Am.Indust.Hygiene Assoc.J. 140, 140 (1973) (Plaintiff's Exhibit 131). Despite the efficiency of this process, because the use of silica sand can ultimately lead to silicosis, sandblasting has been outlawed in the United Kingdom and in other parts of Europe. Id.; see also Gray & Gordy, supra, at 205A-3 ("Sandblasting was banned in the United Kingdom in 1957 and in the European Community in 1966, but is still widely used in the United States, where cases of rapidly progressive silicosis due to this type of exposure have been reported."). In the United States, sandblasting and other forms of abrasive blasting have been subject to differing levels of government regulation, first in the 1910s and 1920s by the Bureau of Mines and later by the National Institutes of Occupational Safety and Health ("NIOSH") and by the Occupational Safety and Health Administration ("OSHA").
As noted above, sandblasting can lead to silicosis in the absence of adequate respiratory protection. "Silicosis is the pneumoconiosis produced by the inhalation of significant amounts (concentrations) of microscopic particles of crystalline free silica." Gray & Gordy, supra, at 205A-1. Silicosis is a progressive disease of the lung that ranges in degree from simple silicosis to conglomerate silicosis. Id. at 205A-9 to 205A-10; see also Parks v. Teledyne Ohio Cast, No. 3065, 1994 WL 101511, at *1 (Ohio Ct.App. Mar 2, 1994). There is no known cure for the disease. Gray & Gordy, supra, at 205A-15.
Generally, diagnosis of silicosis is accomplished through two mechanisms. The first mechanism is an occupational history that is consistent with exposure to respirable free silica. The second mechanism is an X-ray evidencing radiologic changes "consistent with the characteristic pattern of silicosis." Gray & Gordy, supra, at 205A-11. Pulmonary function studies, that is, tests of an individual's breathing capacity, are also employed to ascertain whether a patient suffers from silicosis or from some other type of pulmonary disease. Id. at 205A-13.
The amount of respirable free silica associated with sandblasting is dependent on a number of factors. The most determinative of these factors is the type of job involved. According to literature produced and distributed by Clemco and admitted into evidence at trial, sandblasting operations can be divided into four categories: major sandblasting operations, medium sandblasting operations, minor sandblasting operations, and light duty sandblasting. Generally speaking, what distinguishes one category from another is the type of equipment used. For example, the air compressor may range from 20 to 80 cubic feet in a light duty job to 600 cubic feet in a major operation. Likewise, the *39 nozzle employed in a light duty job may be 1/8" in diameter, while in a major job it might be 3/8". Of course, the length of time in which sandblasting actually occurs has an impact on the amount of respirable free silica produced, as does the environment in which blasting takes place.

The Hoods
One method of providing adequate respiratory protection to sandblasters in an effort to prevent their contracting silicosis is through a sandblasting hood. These hoods come in two general types: those that provide an independent supply of uncontaminated air and those that filter outside air to remove all respirable particles before the blaster inhales them. These hoods and their alleged failure to provide Young with adequate respiratory protection constitute the heart of this litigation.
Young alleges that he wore three different types of protective hoods during his employment with L & M. The first hood was a canvas, non-air fed hood manufactured by Pulmosan. This hood was sold by Clemco as Model HC-1 and by Pulmosan as Model H-30. The second type of hood was an aluminum helmet, air fed hood manufactured by Bullard. It was sold by Clemco as a Model CE until 1963 and as a Model BB from 1963 to 1969; it was also sold by Bullard as a Model 36 from 1963 to 1969 and by Pauli & Griffin as a Number 36. The third type of hood was a plastic helmet, air fed hood manufactured by Bullard and sold by Clemco as a Model PAF from 1969 until 1972 and a Model PCE from 1972 to 1989; Bullard sold this hood as a Model 46. The following chart makes this information easier to comprehend:

TYPE OF HOOD MANUFACTURER SELLER AND MODEL NUMBER
Canvas, non-air fed hood Pulmosan Clemco Model HC-1
 Pulmosan Model H-30
Aluminum helmet, air fed hood Bullard Clemco Model CE (until 1963)
 Clemco Model BB (1963-1969)
 Bullard Model 36 (1963-1969)
 Pauli & Griffin Number 36-LD
Plastic helmet, air fed hood Bullard Clemco Model PAF (1969-1972)
 Clemco Model PCE (1972-1989)
 Bullard Model 46

It was undisputed at trial that Clemco did not manufacture any of these hoods. Rather, it merely acted as a distributor of sandblasting equipment, including respiratory protective hoods. Clemco notes in its brief that Models CE and BB were sold with the Bullard name still on them and with all original literature, instructions, and markings provided by Bullard. However, it concedes that the HC-1 hood was sold with the Clemco name on it. Bullard is an original manufacturer of hoods.

Land & Marine/Tiger Equipment
Loerwald founded L & M in 1963. At about the same time, he also founded Coastal Coatings. Soon after he founded these two companies, Loerwald began to purchase protective hoods that his blasters would need to wear to avoid contracting silicosis and to protect them against ricocheting sand particles. Initially, Loerwald purchased Clemco-supplied equipment from Holders Equipment and Supply ("Holders") in Houston. Later, Loerwald purchased his equipment needs from a variety of vendors, including Welding and Manufacturing Company ("WAMCO"), Philair, Sandair, and Mississippi Valley Silica, all of whom were named as defendants by Young and with whom he settled prior to trial. Sometime in 1965 or 1966, Loerwald formed his own company, Tiger Equipment Company ("Tiger"), the purpose of which was to buy sandblasting equipment wholesale and avoid having to pay middle-men like Clemco.

*40 Young's Employment with L & M
Young was hired by L & M in April of 1967. At first, he worked as a sandblaster's helper. In that capacity, he tended the sandblasting pot, refilling it as necessary, filled paint pots, and performed other tasks as directed. Young worked as a helper for about a year before being promoted to blaster.
During his years as a blaster, Young testified that he would work mostly on-shore at L & M's yard on the Harvey Canal. He would blast barges, tanks, steel pipe, and anything else that came into the yard. Young gave conflicting testimony, however, concerning how frequently he blasted the inside of barges. At trial, Young stated that he blasted inside "at least twice a month." However, in his 1982 deposition, Young had indicated that he blasted the inside of barges only "once a year."
Unfortunately, this discrepancy was not clarified by any other testimony adduced at trial. For example, Otis Logue, who worked at L & M and later became a part owner, testified that he was not aware of L & M doing any blasting of the inside of barges during his tenure there from 1972 to 1986. Logue also testified that he never heard Loerwald or anyone else at L & M talk about blasting inside barges before he arrived at L & M in 1972.
Further discussion of the facts of this case shall be deferred until our analysis of the assignments of error raised by appellants, which necessarily involve a review of the facts therein implicated.

ISSUES
Clemco, by its brief, asserts five assignments of error:
1. The jury's verdict that Young used a Clemco product that proximately caused his injury and that Pulmosan, 3M, and Otis Logue did not cause Young's injury is clearly erroneous.
2. The trial court erred in the wording of Jury Interrogatory 2D, causing the jury to conclude erroneously that Clemco was a professional vendor.
3. The trial court erred in qualifying Dr. Herbert Glindmeyer as an expert and allowing the jury to hear his opinions about the making, marketing, and warnings of sandblasting protective hoods.
4. The trial court erred in its jury instructions when it retroactively applied Halphen v. Johns-Manville Sales Corp., thereby lowering Young's burden of proof, and Young failed to prove a defect.
5. The trial court wrongly instructed the jury on the law relative to aggravation of pre-existing injury and the jury's award of $900,000 in general damages and $300,000 in past and future medical expenses was grossly excessive.
Bullard asserts four assignments of error:
1. The factual finding that Young used a Bullard product was clearly wrong.
2. The jury clearly erred in finding that a Bullard product was a proximate cause of Young's silicosis.
3. The court erred in admitting Dr. Glindmeyer's testimony.
4. The jury erred in finding that the Pulmosan canvas, non-air fed hood was not a proximate cause of Young's injury and in failing to find that the Pulmosan hood was defective.
Young has answered all of these arguments in his brief. Additionally, Young devotes a complete argument to answering Bullard's assertions in two footnotes that the trial court erred in excluding certain invoices documenting hood sales to Coating Specialists, another company owned by Loerwald, and that the trial court erred in excluding Young's responses to certain requests for admission propounded to him by Clemco and Bullard.
In analyzing these issues, we break some of them into their component parts and analyze them individually. Additionally, because Bullard's third assignment of error is identical to Clemco's third assignment of error, both arguments will be collapsed into a single discussion. Likewise, Bullard's fourth assignment of error will be incorporated into the discussion of Clemco's first assignment of error concerning Pulmosan's hoods.

*41 DISCUSSION

A. Clemco Assignment of Error Number 1Jury Finding that Young Used a Clemco Product
With respect to Clemco, this issue is paramount. If we conclude that Young failed to prove that he used any products sold by Clemco to L & M, then the other issues it raises become moot. See Weber v. Fidelity & Cas. Ins. Co., 259 La. 599, 250 So.2d 754, 755 (1971) (requiring proof by a preponderance of the evidence that product was defective and that that defect was a proximate cause of plaintiff's injury); Roberts v. Louisiana Coca-Cola Bottling Co., 566 So.2d 163, 167 (La.App. 4th Cir.), writ denied, 571 So.2d 647 (La.1990). We therefore treat this issue first.
Before considering the merits of this assignment of error, we find it necessary to explicate the manner and scope of our review of this issue. The Louisiana Supreme Court recently clarified the role intermediate appellate courts should play when reviewing the facts of an appeal. See Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099, pp. 8-9 (La. 7/5/94), 639 So.2d 216, 221. In Ambrose, the court stated as follows:
Notwithstanding [our] earlier guidance to reviewing courts in Stobart v. State through DOTD, 617 So.2d 880 (La.1993), it was not our purpose in that case to mandate that the trial court's factual determinations cannot ever, or hardly ever, be upset. Although deference to the factfinder should be accorded, the court of appeal, and the Louisiana Supreme Court, nonetheless have a constitutional duty to review facts. Of course, the reviewing court may not merely decide if it would have found the facts of the case differently. Rather, notwithstanding the belief that they might have decided it differently, the court of appeal should affirm the trial court where the latter's judgment is not clearly wrong or manifestly erroneous. Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court verdict was clearly wrong based on the evidence, or clearly without evidentiary support.
Id., 639 So.2d at 221 (footnote omitted); see also Hines v. Remington Arms Co., 94-0455, p. 6 (La. 12/8/94), 648 So.2d 331, 335. In its latest opinion addressing the question of the intermediate appellate court's standard of review, the supreme court observed that
[t]he Louisiana Constitution provides that the appellate jurisdiction of a court of appeal extends to law and facts. La.Const. 1974, Art. V, § 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate court the power to decide factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual findings will not be upset unless they are manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits.
Ferrell v. Fireman's Fund Ins. Co., 94-1252, pp. 3-4 (La. 2/20/95), 650 So.2d 742, 745.
As we interpret these recent pronouncements, this Court need not defer entirely to the fact finder's determinations; rather, we are empowered and are under a constitutional mandate to review the record in its entirety. See La.Const. art. V, § 10(B); Spiegal, 94-1252, at p. 5, 650 So.2d at 746. Following such review, should we conclude that the fact finder's determinations are clearly wrong or manifestly erroneous, we must reverse them, conduct an independent review of the record, and render a just and proper decision on the evidence adduced at trial. See La.C.C.P. art. 2164; Gonzales v. Xerox Corp., 320 So.2d 163, 165 (La.1975).
Clemco argues that the jury was clearly wrong in finding that Young used any products that it sold. Clemco concedes, as it must, that L & M did, in fact, purchase hoods sold by Clemco. Loerwald specifically testified at trial that when he founded L & M, he purchased Clemco-supplied aluminum helmet, air fed hoods from Holders. Loerwald *42 was able to identify one of the hoods he purchased as one listed in Clemco's 1961 General Catalog No. 6 as Clemco Model CE aluminum helmet, air fed hood. Furthermore, Loerwald stated that he purchased "many" of the Clemco Model HC-1 canvas, non-air fed hoods from Holders. Loerwald went on to testify that he purchased protective equipment from suppliers other than Holders when necessary. Among the alternative suppliers he testified L & M bought hoods from were WAMCO, Philair, Sandair, and Mississippi Valley Silica.
However, once Loerwald started Tiger, L & M tried, as much as possible, to purchase all of its protective equipment from Tiger. Loerwald stated that L & M bought Pauli & Griffin canvas, non-air fed hoods and air fed hoods, as well as Bullard hoods, from Tiger. Invoices from Tiger to L & M confirmed Loerwald's recollections. These invoices reveal that between January 17, 1966, and October 10, 1966, L & M purchased one 36-LD aluminum helmet, air fed hood, 28 H-30 canvas, non-air fed hoods, and 7 H-30-G canvas, non-air fed hoods.[4]
Based on the foregoing, Clemco argues that there was insufficient evidence to establish more probably than not that Young used a Clemco hood. Clemco argues that L & M's regular purchasing of canvas hoods from Tiger (36 hoods in 10 months) is indicative of the fact that the hoods were wearing out and constantly being replaced. Therefore, Clemco suggests that none of the Clemco-supplied canvas hoods that L & M purchased could still have been in use at L & M at the time Young began working there in 1967. Similarly, Clemco avers that the aluminum hoods also have a limited life span and would not have been functional by the time Young began working at L & M. Finally, Clemco contends that by 1960 Sandair did not sell Clemco-supplied products, but was buying directly from Pulmosan and, likewise, between 1963 and 1965, WAMCO did not sell Clemco-supplied products to L & M. Therefore, Clemco claims that these purchases are irrelevant because they are not probative on the issue of whether Young was injured as a result of a Clemco-supplied hood.
In response, Young asserts that there could have been Clemco-supplied hoods present at L & M when he began working there. This fact is supported by Young's trial testimony that he used the Clemco-supplied canvas, non-air fed hood while sandblasting and his unequivocal identification of a Clemco-supplied hood from one of its catalogs as the hood he used. Young also points out that Loerwald testified that he saw Young using the Clemco-supplied canvas, non-air fed hood. Young further argues that Clemco's claims that both the air fed and non-air fed hoods were replaced due to deterioration is incorrect in light of Loerwald's testimony that L & M bought more hoods as the need arose, not due to deterioration.
We find that the jury was well within its discretion to conclude that Young used a Clemco-supplied hood. Resolution of this issue ultimately required the jury to weigh the credibility of the testimony of various witnesses, along with the documentary evidence introduced at trial. The jurisprudence clearly establishes, even under Spiegal and Ambrose, that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).[5] Moreover, "[w]here two permissible, i.e., reasonable, views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous." Hines, 94-0455, at p. 6, 648 So.2d at 335. Our conclusion that the jury properly exercised its discretion *43 is based on our judgment that it could properly have inferred that Clemco-supplied hoods were present at L & M by rejecting Clemco's theory that its hoods were destroyed due to repeated use and lack of maintenance and by accepting Young's identification of a Clemco hood at trial.
We find no manifest error in the jury's conclusion that Young did, in fact, use a Clemco hood, nor can we say that this conclusion is clearly wrong. Accordingly, this assignment of error is without merit.

B. Bullard Assignment of Error Number 1Jury Finding that Young Used a Bullard Product
As was true with Clemco, this argument by Bullard is paramount. Absent reliable evidence that Young actually used a product that Bullard either manufactured or sold, Bullard cannot be held liable for Young's injury. Should we reach this conclusion, all other assignments of error advanced by Bullard are moot. Thus, we choose to treat this issue before considering any other arguments advanced by either Clemco or Bullard.
The two Bullard hoods at issue were the aluminum helmet, air fed hood and the plastic helmet, air fed hood. However, only the aluminum helmet, air fed hood is implicated in this appeal because no witnesses were asked if they ever saw Young using a plastic helmet, air fed hood. Bullard asserts that the only evidence that places an aluminum hood on Young's head is Young's own testimony, which Bullard claims should be discounted because of discrepancies between his deposition testimony and his testimony at trial. Bullard highlights the testimony of Manfred Nicklas, a former foreman at L & M, who stated that he saw Young using a Pulmosan canvas air fed hood and that he never saw Young using a aluminum hood.
In response, Young claims that his own testimony is believable and that Otis Logue testified that he saw Young using an aluminum air fed hood. Young argues that Nicklas' testimony that L & M rejected the aluminum hoods is not believable in light of Loerwald's testimony that he purchased aluminum air fed hoods and that even if Nicklas is believed, that does not mean that Young never used an aluminum air fed helmet, but only that Nicklas never saw Young using one.
We find that the jury's conclusion with regard to Young's use of a Bullard air fed hood is not manifestly erroneous. The critical point raised by Bullard is the alleged inconsistencies between Young's 1982 deposition description of the hood he wore and his identification of a Bullard hood at trial. Although Young's deposition was not presented to the jury in toto, Bullard and Clemco offered an excerpt of his deposition into evidence as Bullard/Clemco Joint Exhibit 4. In that testimony, Young described the air fed hood as brown with a canvas cloth and having "an air thing running about on the top of it about the size of your finger." Young stated that the lens of the hood was "regular glass" and that there was no hardhat underneath.
At trial, Young stated that what he was referring to when he said the air fed hood was canvas "was the part down here that goes all the way down here, not the aluminum part." Young also stated that what he "meant by the air-fed hood was the canvas hood, the aluminum hood that the canvas comes down here on, not in the top of it, down here. This end was aluminum, this part here." This testimony makes it clear that when Young stated that the air-fed hood was canvas, what he was referring to was the canvas shroud on the hood that covers the blaster's shoulders and chest, not the aluminum helmet that rests on the blaster's head. Bullard manufactured two hoods that fit this general description: the Model 36 aluminum helmet, air fed hood, and the Model 46 plastic helmet, air fed hood. However, any doubt as to which hood Young was referring to is laid to rest by his emphatic testimony at trial that the air fed hood he recalled wearing had an aluminum helmet in it.
Although this evidence is somewhat contradictory, we conclude that the contradictions are not so evident as to establish definitively that the jury's conclusion that Young used a Bullard product is either clearly wrong or manifestly erroneous. Rather, the evidence permitted the jury to reach one of two alternative conclusions: that Young used *44 a Bullard hood that he had difficulty describing accurately or that Young did not in fact use a Bullard product. As we noted above, "[w]here two permissible, i.e., reasonable, views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous." Id., 648 So.2d at 335.
We cannot say that the jury's conclusion that Young used a Bullard hood is either clearly wrong or manifestly erroneous. This assignment of error is without merit.

C. Clemco Assignment of Error Number 1/Bullard Assignment of Error Number 4Jury's Finding that Pulmosan, 3M, and Otis Logue Were Not Responsible for Young's Injury
Clemco next asserts that the jury committed manifest error in finding that Pulmosan, 3M, and Otis Logue were not at fault in causing Young's injury. Bullard makes this same assertion with respect to Pulmosan only. Because none of these parties were present at trial, Clemco and Bullard bore the burden of proving by a preponderance of the evidence that these parties were at fault in causing Young's injury. See Raley v. Carter, 412 So.2d 1045, 1047 (La.1982); Giarratano v. Krewe of Argus, Inc., 449 So.2d 530, 534 (La.App. 5th Cir.), writ denied, 456 So.2d 170 (La.1984). We will discuss the role of each of these actors in turn.

1. Pulmosan
As noted above, Pulmosan manufactured the canvas, non-air fed hood at issue in this case. Pursuant to Jury Interrogatory 6, the jury specifically concluded that during Young's employment at L & M, he used a product manufactured by Pulmosan; it also concluded that Clemco and Bullard did not prove that a Pulmosan product was a proximate cause of Young's silicosis.[6] Thus, according to Clemco and Bullard, the jury erred in not finding that Pulmosan at least contributed to Young's injury because it manufactured the hoods that he used.
As an initial matter, to hold Pulmosan liable, we must find that the jury correctly concluded that Young in fact used a Pulmosan hood. We think that this was a proper conclusion, based on the undisputed testimony in the record that Young wore the non-air fed hoods available at L & M. Moreover, none of the parties to this appeal seriously dispute this issue. Thus, we find that Young did use a Pulmosan hood. We thus turn to the issue of Pulmosan's liability.
There is little doubt that the Pulmosan hood failed to provide Young with adequate respiratory protection while blasting. Young's own expert witness, Dr. Henry Glindmeyer, offered the following testimony concerning the Pulmosan hood:
Well, there are two problems with the hood. First of all, the individual breathing must take air from the outside. There's no independent air supply. And the only way that air can get into the hood is either underneath and through the bottom of the hood opening or through these screens. The screens are not fine enough to remove respirable particles, and therefore, though it may protect against impact, it may protect against ricochet, it will not protect from respirable particles.
Later, Dr. Glindmeyer stated that wearing no hood
is a risk, but it may be insignificant next to the exposure of the same individual who's using a canvas hood and intimate with the dust exposure where the dust level might be 100 times the acceptable limit where and again, the canvas hood also provided absolutely no protection.
*45 Finally, Dr. Glindmeyer stated that the Pulmosan hood "should not be used for sandblasting under any circumstances."
We conclude, based on the evidence adduced at trial, that the jury was clearly wrong and committed manifest error in not finding Pulmosan liable for Young's injury. In reaching this conclusion, we note that it was not necessary for this court to consider matters such as the credibility of witnesses, nor was it necessary to resolve any disputes created by contradictory evidence. In point of fact, the evidence overwhelmingly established Pulmosan's liability. The testimony of Dr. Glindmeyer, plaintiff's own expert witness, could not have been any clearerthe Pulmosan hood, because it lacked an independent supply of air uncontaminated by respirable free silica, should not have been used at all for any kind of sandblasting operation, be it light duty, minor, medium, or major. Moreover, the evidence unquestionably confirmed that Loerwald purchased Pulmosan-manufactured non-air fed hoods, that Young, an L & M employee, used those hoods while engaged in sandblasting, that the Pulmosan hood provided him with absolutely no respiratory protection, and that the defects in the Pulmosan hood were thus a proximate cause of Young's developing silicosis. Cf. Porter v. American Optical Corp., 641 F.2d 1128, 1142 (5th Cir.) (upholding jury verdict that respirator worn by plaintiff that allowed him to inhale dangerous levels of asbestos particles constituted a proximate cause of his injury), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).
Accordingly, the jury committed manifest error in concluding that a product manufactured by Pulmosan was not a proximate cause of Young's injury. We therefore reverse this finding of the jury and will adjust the judgment accordingly.

2. 3M
Clemco next contends that 3M is jointly responsible for Young's injury and that Clemco's own liability should be reduced proportionately. 3M was responsible for manufacturing a dust mask that Young wore under the canvas hood. By Jury Interrogatory 7, the jury specifically concluded that Young had used a product manufactured by 3M. However, it refused to find 3M liable for Young's injury, concluding that a product worn by 3M was not a proximate cause of Young's injury.[7]
As was true with the Pulmosan non-air fed hood, Young's own expert testified that the 3M dust mask was defective because it failed to provide respiratory protection to the wearer. Dr. Glindmeyer opined that the 3M dust mask "provided virtually no protection." Clemco thus asserts that the jury erred by not finding that 3M's dust mask was a proximate cause of Young's silicosis.
Although this is a close issue, we are forced to reject Clemco's argument. As noted earlier, Clemco bore the burden of proving, by a preponderance of the evidence, 3M's liability. See Raley, 412 So.2d at 1047; Giarratano, 449 So.2d at 534. Under the law of products liability applicable to this case, Clemco could discharge this burden by showing that 3M's mask was unreasonably dangerous in normal use due to its design, composition, or manufacture. See Weber, 250 So.2d at 755. Applying this standard to the record before us, we conclude that the jury correctly exonerated 3M from any liability for Young's injury.
Clemco did prove that Young wore the 3M mask and that the 3M mask failed to provide Young with any respiratory protection. However, Clemco did not establish that the *46 3M mask was defective in design, composition, or manufacture. As to design, Clemco produced no evidence whatsoever that established either the purpose or expected use of the mask. For all we know based on the record, the 3M mask may only have been designed for use in the operating room and was never meant to provide any respiratory protection against respirable free silica. We also note that Clemco never proved that 3M knew or should have known that it was reasonably foreseeable that its dust mask would be used in environments with air contaminated by respirable free silica particles. There was simply no evidence whatsoever as to what this mask was designed to do or how it was advertised or represented. In other words, in order to show that the mask was defective in design, Clemco needed to show what the design of the mask was. It simply did not do so and thus we cannot conclude that the mask was defective in design.
Likewise, Clemco offered no proof that tended to show that the mask was defective in composition or manufacture. For example, Clemco did not show that the mask would have provided adequate protection against respirable free silica had it been composed of a different product. Similarly, Clemco offered no proof that the actual mask worn by Young deviated in some fashion from 3M's design specifications and was thus defective in manufacture.
Because of the lack of evidence that 3M was culpable in some manner with respect to the use of its mask in sandblasting environments, Clemco simply failed to meet its obligation to prove 3M's liability by a preponderance of the evidence. Therefore, the jury was not manifestly in error when it concluded that Clemco had not proved by a preponderance of the evidence that a product manufactured by 3M was a proximate cause of Young's silicosis.
Moreover, even assuming that Clemco had discharged its burden of proving that the 3M mask was somehow defective, the evidence adduced at trial established that the defects in the hoods Young woreespecially the non-air fed hood that he wore in conjunction with the 3M maskdiscussed infra were the predominate cause of Young's injury. This Court recently had occasion to consider the doctrine of concurrent causation in a similar settingan asbestosis case. See Quick v. Murphy Oil, 93-2267 (La.App. 4th Cir. 9/20/94), 643 So.2d 1291, writ denied, 94-2583 (La. 1/6/95), 648 So.2d 923. In that case, Quick, a worker who developed asbestosis, brought suit against a number of different asbestos manufacturers, alleging that each was responsible for his injury. One of the manufacturers named as a defendant, Owens Corning Fiberglass ("OCF"), settled the claim against it for $92,000 and then filed a third-party claim against another manufacturer, Garlock, Inc. ("Garlock"). The trial court found OCF and Garlock to be solidarily liable and rendered judgment against Garlock for its virile share of the settlement, $46,000. Garlock appealed to this Court.
On appeal, Garlock argued that the trial court erred in finding it liable because OCF did not prove that plaintiff had ever been exposed to any Garlock-manufactured product containing asbestos. After reviewing a number of federal cases in which similar issues had been considered, this Court proceeded to examine the question of cause-in-fact. Initially, we noted that "[a]sbestos cases typically involve multiple defendants and courts have analyzed the cases under concurrent causation, a doctrine which `proceeds from the assumption that more than one defendant substantially contributed to the plaintiff's injury.'" Id. at p. 8, 643 So.2d at 1294 (quoting 210 E. 86th Street Corp. v. Combustion Eng'g, Inc., 821 F.Supp. 125, 150 (S.D.N.Y.1993)). We then noted that Garlock contended that under this theory it could not be jointly liable with OCF because its conduct was not a "predominate" cause of the plaintiff's injury. After reviewing the evidence adduced at trial, we accepted Garlock's contention and reversed the judgment against it, stating "[b]ecause the record clearly establishes that Quick's exposure to asbestos-containing products manufactured by Garlock was trivial, it was not a substantial contributing factor in Quick's asbestosis and was not a cause in fact of that harm." Id. at p. 15, 643 So.2d at 1297.
We note that silicosis cases such as this one before us often present similar considerations *47 and call for application of the comparative causation doctrine. Accordingly, we find that the jury was entitled to conclude, as do we, that the 3M dust mask, despite the fact that it provided no respiratory protection, did not play a "`substantial part in bringing about or actually causing [Young's] injury, disease or damage.'" Id. at p. 11, 643 So.2d at 1296 (quoting In re Manguno, 961 F.2d 533, 534 (5th Cir.1992)) (emphasis omitted). Rather, the principal causes of Young's silicosis were the defects inherent in the hoods he wore. Had those defects not existed or had Young and/or his employer not been misled by inaccurate representations concerning appropriate conditions for use of the non-air fed hood then his silicosis might not have developed, even if he had continued to use the 3M dust mask. Under these circumstances, 3M is not liable for Young's silicosis; we reject Clemco's argument to the contrary.

3. Otis Logue
Finally, Clemco contends that Otis Logue should share in its liability. The essence of Clemco's argument is that in light of his vast experience in the sandblasting field, Logue was under the same duty as Loerwald to inform L & M employees about silicosis. Young does not refute this argument in any substantive fashion.
Before this Court may find any personal liability on the part of Logue (as opposed to any vicarious liability imputed to his employer) sufficient to reduce the liability of Clemco and Bullard, it must be shown that Logue was an "executive officer" of his employer, L & M. Pursuant to Jury Interrogatory 14, the jury indicated that defendants proved by a preponderance of the evidence that Logue was an executive officer of L & M. However, the jury then refused to find Logue liable for Young's injury.[8]
Under established jurisprudence of the Louisiana Supreme Court, four inquiries are necessary to determine whether an executive officer of a corporation can be held personally liable for a co-employee's injuries. These inquiries are as follows:
1. The principal or employer owes a duty of care to the third person (which in this sense includes a co-employee), 21 breach of which has caused the damage for which recovery is sought.
2. This duty is delegated by the principal or employer to the defendant.
3. The defendant officer, agent, or employee has breached this duty through personal (as contrasted with technical or vicarious) fault. The breach occurs when the defendant has failed to discharge the obligation with the degree of care required by ordinary prudence under the same or similar circumstanceswhether such failure be due to malfeasance, misfeasance, or nonfeasance, including when the failure results from not acting upon actual knowledge of the risk to others as well as from a lack of ordinary care in discovering and avoiding such risk of harm which has resulted from the breach of the duty.
4. With regard to the personal (as contrasted with technical or vicarious) fault, personal liability cannot be imposed upon the officer, agent, or employee simply because of his general administrative responsibility for performance of some function of the employment. He must have a personal duty towards the injured plaintiff, breach of which specifically has caused *48 the plaintiff's damages. If the defendant's general responsibility has been delegated with due care to some responsible subordinate or subordinates, he is not himself personally at fault and liable for the negligent performance of this responsibility unless he personally knows or personally should know of its non-performance or mal-performance and has nevertheless failed to cure the risk of harm.
Canter v. Koehring Co., 283 So.2d 716, 721 (La.1973) (emphasis added); see also Joseph v. Albarado, 407 So.2d 1277, 1285-86 (La. App. 4th Cir.1981).
Applying these inquiries to the evidence adduced at trial convinces us that the jury was not clearly wrong in concluding that Logue did not breach a duty that he personally owed to Young and that such breach was a proximate cause of Young's silicosis. The relevant testimony at trial established the following facts: Logue began working at L & M in 1972, where he worked for the next 14 years. Initially, Loerwald placed Logue in charge of safety at L & M, although there was no testimony as to what was expected of Logue in this capacity, nor was there any evidence that he had any control over what equipment was available to L & M employees to protect them against the occupational hazards associated with sandblasting, including silicosis. Eventually, while Young was still working at L & M, Logue became the company's president, although there was no testimony as to how much control Logue had in light of the fact that Loerwald continued to own the company. Finally, Loerwald did testify Logue conducted some safety meetings while employed at L & M.
Taken together, this evidence fails to establish that Logue owed any specific duty to Young or that he breached any duty that proximately caused Young's silicosis. Although Logue may have had a general responsibility to ensure that safe working conditions existed at L & M, this is not sufficient to impose personal liability on him. Clemco bore the burden of proving that Logue owed a specific duty to Young, the breach of which proximately resulted in Young's developing silicosis. See Canter, 283 So.2d at 721. Our review of the record convinces us that all Clemco succeeded in proving was that Logue owed some general duty to L & M employees to keep them advised as to safety issues. The Louisiana Supreme Court has specifically held that proof that an executive officer owed only a general duty to his co-employees precludes any personal liability on his part, although it may be sufficient to impose vicarious liability on L & M. Id.
We are thus unable to conclude that the jury erred in finding that Logue did not breach a personal duty that he owed to Young. Accordingly, this assignment of error is without merit.

D. Clemco Assignment of Error Number 2Wording of Jury Interrogatory 2D
Jury Interrogatory 2D asked as follows: Did plaintiff, John Young, prove by a preponderance of the evidence that, in the sale of a product through a distributor to Land & Marine & Coastal Coatings, Clemco Industries Corporation held itself out as the manufacturer of the product or was a professional vendor?
Clemco contends that this interrogatory was erroneous because it included only one prong of the test for professional vendor status. Thus, Clemco claims that the jury could have wrongly concluded that Clemco was a professional vendor by applying only that single prong, resulting in the application of a more stringent standard of liability to Clemco. Young counters that the jury was properly instructed as to the law of professional vendor status and that a jury interrogatory need not repeat verbatim matters on which the jury has already been instructed. Apparently in anticipation of this argument, Clemco asserts parenthetically in its brief that "in this case wasn't the interrogatory a form of instruction."
In considering this issue, we apply the manifest error standard of review. State, Dep't of Transp. & Dev. v. McMillion Dozer Serv., 93-590 (La.App. 5th Cir. 5/31/94), 639 So.2d 766, 768; Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1153 (La. App. 3d Cir.1991). Before the jury verdict *49 may be overturned due to an alleged error in a jury interrogatory, the complaining party must show that the "jury interrogatories are so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts." Doyle, 576 So.2d at 1153.
On its face, Jury Interrogatory 2D does appear to be erroneous by including only one component of the test for professional vendor status. However, a deeper examination of the record, including the entirety of the jury instructions delivered by the trial court, proves this argument to be fallacious. Initially, we note that the trial court did in fact give an adequate jury charge on the issue of professional vendor status, one that properly addressed each prong of the relevant test. The actual charge delivered by the trial court on this issue was as follows:
Plaintiff John Young also contends that in selling the product which proximately resulted in his silicosis condition, that Clemco Industries Corporation held itself out as the manufacturer of the product or was a professional vendor of the product, and, as such, is subject to the same strict product liability standards as the manufacturer of the product.
In order to subject Clemco to the same strict product liability standards of a manufacturer, plaintiff must prove by a preponderance of the evidence that Clemco Industries Corporation in the sale of the product in question held itself out to be a manufacturer of the product or a professional vendor of the product.
If plaintiff carries this burden, then the liability of Clemco Industries Corporation will be considered under the same strict product liability standards as the manufacturer.
A professional vendor is a retailer who does more than simply sell a certain product or products. To be so classified, it must engage in practices whereby it is capable of controlling the quality of the product.
You must also consider the size, volume, and merchandising practices of the seller in order to bring the seller within the class of professional vendors who are presumed to know of the defects in their wares.
This charge properly instructs the jury as to all elements of the professional vendor status under Louisiana law. See Chappuis v. Sears Roebuck & Co., 358 So.2d 926, 930 (La.1978). Clemco did not object to this instruction; rather, it objected only to the wording of Jury Interrogatory 2D.
This excerpt from the jury charge makes clear that the jury could impose strict products liability on Clemco under one of two theories: that Clemco was a manufacturer of the product in question or that it was a professional vendor. Jury Interrogatory 2D was thus asking the jury if it found that Clemco was liable under either of these alternatives. In other words, the "manufacturer" language was not included in Jury Interrogatory 2D for purposes of the professional vendor status test but as an independent theory under which the jury could impose strict products liability against Clemco. Accordingly, this assignment of error is without merit.

E. Clemco Assignment of Error Number 3/Bullard Assignment of Error Number 3Admission of Dr. Glindmeyer's Testimony
The single expert witness to testify on Young's behalf as to the alleged flaws in the protective hoods Young wore while blasting was Dr. Henry Glindmeyer, a Research Professor of Medicine at the Tulane University School of Medicine and an Associate Professor of Engineering at the Tulane University School of Engineering. Dr. Glindmeyer has held both of those positions since 1988; his trial testimony establishes his extensive involvement as a consultant in silicosis cases. Dr. Glindmeyer was tendered by the plaintiff as an expert in biomechanical engineering, specifically in three areas: evaluation of criteria for inadequate design of respiratory protection, evaluation of designs to see if they are acceptable for respiratory protection, and evaluation of quality control testing of devices to determine if they meet original design criteria.
Both Clemco and Bullard argue that the trial court erred in qualifying Dr. Glindmeyer *50 as an expert witness on behalf of Young, asserting that he lacked sufficient expertise and that his testimony was not grounded in scientific validity. This court has visited this issue once before on writs, which were denied on the basis that there was "no error in the trial court's rulings which permitted Dr. Henry W. Glindmeyer to testify as an expert witness." Young v. Logue, 93-1327 (La.App. 4th Cir.1994). The law of the case doctrine does not bar subsequent reconsideration of this issue on appeal. Wells v. Gillette, 620 So.2d 301, 303 (La.App. 4th Cir.), writ denied, 629 So.2d 396 (La. 1993).
The starting point for analyzing this argument is La.C.E. art. 702, which provides that
[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
La.C.E. art. 702. The Louisiana version of this article tracks precisely the federal equivalent, see Fed.R.Evid. 702, and thus the jurisprudence interpreting the federal article is appropriate for examination. Consequently, in applying article 702 to the facts of this case, we must consider the United States Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which addressed the standard for admitting expert testimony under Fed.R.Evid. 702.[9]
Under Daubert, before an expert's opinion testimony may be admitted, the trial court must consider four factors:
(1) The "testability" of the expert's theory or technique,
(2) Whether the theory or technique has been subjected to peer review and publication,
(3) The known or potential rate of error, and
(4) Whether the methodology is generally accepted in the scientific community.
Id. at ___ _ ___, 113 S.Ct. at 2796-97; Clement, 634 So.2d at 427. The Daubert factors are not a rigid, uncompromising test. Daubert, ___ U.S. at ___, 113 S.Ct. at 2797. If the testimony of a proposed expert witness does not satisfy one of these four inquiries, it does not automatically make that testimony inadmissible. The trier of fact remains empowered to exercise discretion to admit expert testimony it believes is relevant and constitutes "[p]ertinent evidence based on scientifically valid principles." Id. at ___, 113 S.Ct. at 2799.
We conclude that the trial court did not err in admitting Dr. Glindmeyer's testimony. Initially, we note that Dr. Glindmeyer's academic credentials more than qualify him under La.C.E. art. 702. Dr. Glindmeyer holds both a Master's degree in mechanical engineering and a Ph.D. in biomedical engineering from Tulane University. Dr. Glindmeyer has a lengthy tenure as a professor of medicine at the Tulane University School of Medicine, having taught in varying capacities since 1971. He also is one of a handful of non-physician Fellows of the American College of Chest Physicians, having been a member of that organization since 1983. Dr. Glindmeyer serves as a manuscript consultant for three different academic publications: Journal of the American College of Chest Physicians, American Review of Respiratory Disease, and Journal of Occupational Medicine. Dr. Glindmeyer's curriculum vitae reflects his extensive publication in the field of pulmonary function testing. *51 Thus, we find that Dr. Glindmeyer falls within the ambit of persons qualified under La.C.E. art. 702 to offer expert opinion testimony.
Furthermore, application of the Daubert Foret test does not require the exclusion of Dr. Glindmeyer's testimony. Much of Dr. Glindmeyer's theory as to the causes of Young's (and other blasters') silicosis can be found in his article "Contributing Factors to Sandblasters' Silicosis: Inadequate Respiratory Protection Equipment and Standards," published in 1988 in the Journal of Occupational Medicine. In that article, Dr. Glindmeyer and his co-author opine that the supplied air flow rates manufacturers indicated were sufficient to provide adequate respiratory protection to blasters wearing air fed hoods were, in fact, insufficient. In addition, they note that the current procedure employed to test the adequacy of a respiratory protective hood was designed in 1937 and fails to reflect actual sandblasting conditions in at least nine different respects.
Dr. Glindmeyer drew on much of the same information in framing his testimony at trial, which included his opinions that hood manufacturers such as Bullard were at fault for recommending non-air supplied hoods for blasting operations, for not testing the hoods independently and simply relying on BOM or NIOSH approval as sufficient evidence of the hoods' efficiency, and for failing to have an adequate quality control program in their manufacturing facilities. Even though this was his only publication on these issues, we conclude that admission of his opinions was permissible under Daubert /Foret. Although additional publications would have reinforced Dr. Glindmeyer's expertise in the field, Daubert itself cautions that publication of an expert's theory in peer-reviewed journals is not the sine qua non of admissibility. Daubert, ___ U.S. at ___, 113 S.Ct. at 2797 ("The fact of publication (or lack thereof) in a peer-reviewed journal will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.") (emphasis added).
Clemco and Bullard complain vigorously of Dr. Glindmeyer's lack of training or work experience in the design, manufacture, or marketing of positive pressure air fed respiratory protection equipment. This argument is misplaced. Dr. Glindmeyer's testimony addressed the design of respiratory equipment as it related to supplied air flow rates, not as to how the hood is actually manufactured. Therefore, his lack of actual work experience is immaterial.
Bullard and Clemco also complain that Dr. Glindmeyer never actually tested any of their hoods. They also argue that Dr. Glindmeyer's testimony was inadmissible because his knowledge was derived solely from reading the hearsay testimony of others and not through first-hand testing and study. The fact that Dr. Glindmeyer has never actually tested the equipment in question is a troubling point. However, our review of the entirety of his testimony convinces us that it was permissible. Under La.C.E. art. 703, an expert may rely on otherwise inadmissible evidence if it is of a type that is reasonably relied on by experts in the same field. Neither Clemco nor Bullard adduced any evidence at trial to show that Dr. Glindmeyer's methodology of relying on studies, depositions, and other documents was scientifically circumspect. We conclude that Dr. Glindmeyer acted within the boundaries of scientific methodology in forming his opinions and that those opinions were properly admissible in this case. Therefore, the trial court did not err in qualifying Dr. Glindmeyer as an expert witness and allowing the jury to hear his opinions concerning the making, marketing, and warnings of sandblasting protective hoods. This assignment of error is without merit.

F. Clemco Assignment of Error Number 4/Bullard Assignment of Error Number 2Retroactive Application of Halphen v. Johns-Manville Sales Corp. and Failure to Prove a Defect

1. Retroactive Application of Halphen v. Johns-Manville Sales Corp.

Clemco alleges that the trial court erred in its instructions to the jury concerning the law of strict products liability by using a charge that tracks the language of Halphen v. Johns-Manville Sales Corp., 484 *52 So.2d 110 (La.1986). Before considering the merits of this argument, we find it appropriate to delineate the standard of review applicable when reviewing challenges to jury charges. To begin, "an appellate court must consider the jury instructions as a whole when trying to determine whether those instructions were so incorrect or deficient as to constitute reversible error." Clement, 634 So.2d at 430 n. 6. In addition,
[w]here small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial. Furthermore, the manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts. Thus, on appellate review of a jury trial the mere discovery of an error in the judge's instructions does not of itself justify the appellate court conducting the equivalent of a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case.

Brown v. White, 405 So.2d 555, 558 (La.App. 4th Cir.1981) (emphasis added; citations omitted), aff'd, 430 So.2d 16 (La.1982). Thus, we are required to undertake two inquiries in evaluating the merits of Clemco's assertions. First, did the trial judge's charge to the jury contain error? Second, if there was error, was that error so prejudicial as to prevent the jury from reaching a verdict based on the law and facts of the case? In answering this second inquiry, we look to the entirety of the instructions, as well as any argument of counsel drawing on the alleged improper instruction and testimony of witnesses incorporating the erroneous instruction.

a) Did the trial judge's charge to the jury contain error?
There is no question on the record before us that the trial judge instructed the jury on the law of products liability as it existed between 1986 and 1988, that is, under Halphen. In fact, the trial judge himself stated that "[m]y charge is replete with Halphen." According to Clemco, the trial court was bound to apply the law of products liability as it was when Young's cause of action arose in 1981, in other words, pre-Halphen products liability. Clemco alleges that because Halphen created substantive law, it is not retroactive and thus should not have been included in the trial court's instructions to the jury. In response, Young asserts that in Halphen, the Louisiana Supreme Court was relying on prior case law, specifically Weber v. Fidelity & Cas. Ins. Co., 259 La. 599, 250 So.2d 754 (1971), to reach its holding and that Halphen `s principles of law can thus be applied to this case.
We find that Clemco is correct in asserting that the trial judge erred in his charge to the jury. Further, we reject Young's argument that Halphen simply reasserts long-standing Louisiana law. Rather, we are of the opinion that Halphen did, in fact, alter the law of products liability in Louisiana and thus should not be applied retroactively. To illustrate this point, we offer the following review of the evolution of products liability law in Louisiana.
Under the Louisiana Supreme Court's decision in Weber, a manufacturer of a product could be held strictly liable to a person injured due to a defect in the design, composition, or manufacture of the product. Id. at 755, 250 So.2d 754. However, "[i]f the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them." Id. at 756, 250 So.2d 754.
Under Halphen, these three categories of products liability persisted. In addition, liability could be imposed when a product was found to be "unreasonably dangerous per se." Halphen, 484 So.2d at 113. A product was deemed unreasonably dangerous per se "if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product." Id. at 114. This was a new jurisprudential development in Louisiana. See Michelle M. Hoss, Note, Halphen v. Johns-Manville Sales Corp.A New Product In the Area of Products Liability, 47 La. *53 L.Rev.637, 640 (1987). Halphen, however, did not endure as the law of Louisiana. In 1988, the Louisiana Legislature repealed Halphen`s category of unreasonably dangerous per se when it enacted the Louisiana Products Liability Act ("the Act"). See La. R.S. 9:2800.51 et seq.
Under the Act, liability may be imposed on a manufacturer when a product is found to be unreasonably dangerous in one of four ways: construction or composition, design, inadequate warning, or nonconformity to express warranty. The Act specifies that these four theories "are the exclusive theories of liability for manufacturers for damage caused by their products." La.R.S. 9:2800.52. Clemco correctly points out that in Gilboy v. American Tobacco Co., 582 So.2d 1263 (La.1991), the supreme court opined that Halphen`s theories of recovery are substantive rights that cannot be retroactively revoked by the Act. Thus, according to Clemco, just as Halphen`s theories of recovery cannot be denied to a plaintiff whose cause of action arose prior to the Act, neither can those theories be applied to cases where the cause of action arose prior to Halphen in 1986.
We conclude that this is correct. Halphen applies only to causes of action that arose between the time that decision was rendered and the effective date of the Act, September 1, 1988. Causes of action that accrued after September 1, 1988, are governed by the Act. Causes of action that accrued prior to Halphen are governed by the law of products liability as expressed in Weber and its progeny. Therefore, because this action was filed in 1981, it is governed exclusively by Weber. Accordingly, the trial court erred in delivering a jury instruction based on Halphen. We turn next to the question of whether this instruction constituted prejudicial error.

b. Was that error prejudicial?
We conclude that the record discloses no evidence that Clemco was prejudiced as a result of the erroneous jury instruction. First, our review of the record discloses no use by Young of the theory of unreasonably dangerous per se during expert testimony. Second, nothing within the jury interrogatories made reference to the category of unreasonably dangerous per se. Finally, because neither opening statements nor closing arguments were transcribed, we were unable to discern whether counsel relied on Halphen when addressing the jury. The only evidence to the contrary is the following colloquy that took place prior to the jury being charged:
THE COURT:
Gentlemen, before I give the charge to the jury and present my interrogatories, I want to give you another opportunity to see if you have any further objections to my charge or to the interrogatories other than what you put on the record prior to closing arguments.
Mr. Bruno, any further objections, sir?
MR. BRUNO:
No further objections, Your Honor.
THE COURT:
Miss Lewis?
MR. NELSON:
We would, Judge, because Mr. Bruno has said that the 36 hood is not unreasonably dangerous per se, and I don't think you should be charging the jury on that issue now. (emphasis added).
Although this excerpt leads one inferentially to believe that counsel for Young may have relied on Halphen in his closing argument, it does not amount to sufficient proof that Clemco was prejudiced as a result or that any prejudice precluded the jury from reaching a verdict grounded in law and fact. As noted by the court in Brown v. White,
[a] Court of Appeal must exercise great restraint before throwing out a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Invariably, jury instructions, especially those requested by parties, are arguably incorrect, and the loser at trial can usually find some deficiencies in them. But the question is whether the jury was misled to the extent that it was prevented from doing justice.
405 So.2d at 560 (emphasis added). Therefore, we conclude that there was no prejudicial *54 error as a result of the trial court's erroneous jury instruction.

2. Failure to Prove a Defect
Clemco next asserts that even if the trial court was correct in its instruction to the jury, Young should not have prevailed because he did not prove a defect in the product or a failure to warn. Likewise, by its second assignment of error, Bullard claims that Young failed to prove that its hoods were defective. We reject both of these arguments. Initially, with respect to the Clemco Model CE/BB/Bullard Model 36 aluminum helmet, air fed hood, Dr. Glindmeyer's testimony affirmatively established that the maximum flow rate of this hood was 14.2 cubic feet per minute. However, he indicated that this rate of flow was sufficient only for the blaster's needed air; it did not provide any additional air flow so as to produce a "flushing" effect that would keep dust particles from entering the hood through migration. As a result, because the air fed hood is shroud-shaped, the user could inhale dust particles that came in from underneath the hood.
In addition, Dr. Glindmeyer's testimony noted that the Clemco literature advertising this hood stated that the flow rate could be adjusted so as to suit the user's comfort level. According to Dr. Glindmeyer, this constituted a defect in marketing the product because the air flow rate should be set at its highest level in order to ensure that there is sufficient air pressure to supply the user's needs and to produce the required flushing effect. Dr. Glindmeyer's assertion was corroborated by the testimony of Otis Logue, who stated that he had encountered what he considered to be misleading representations in sales literature that overstated the adequacy of approved equipment.
Third, Dr. Glindmeyer established that the air fed hood was defective because the blaster had no way to know that he was overbreathing the hood. When the hood went from positive pressure to negative pressure due to the user's overbreathing, contaminated air from outside the hood would enter from underneath. In contrast, for example, with a tight-fitting air respirator mask such as the surplus Army gas masks sometimes used by the blasters at L & M, blasters would immediately know of the lack of air because they would have difficulty breathing.
Fourth, Dr. Glindmeyer opined that the air fed hood was defective because the 46-4 Clemco valve used in the hood provided less than 6 cubic feet per minute of air. This is below the BOM standard for minimum air flow. Furthermore, Clemco never advised its customers that the 46-4 valve should be replaced with an identical valve in order to maintain the hood's integrity. Thus, in cases where the 46-4 valve was replaced with another valve, the hood would not function as designed. On this point, Logue, who was a Clemco salesman before joining L & M, testified that no one at Clemco ever made him aware of the need to replace the Clemco valve with another Clemco valve.
Clemco strenuously argues that the testimony of Otis Logue, Robert Pauli (President of Pauli & Griffin and its corporate representative at trial), and Richard Miller (Bullard's Vice-President of Marketing Administration and one of its corporate representatives at trial) all establish that they never received any complaints about the air fed hood being overbreathed and that had there been any such complaints, they would have been in a position to know of them. Further, Clemco argues that the testimony of its experts, Dr. Peter Raven and Dr. Behzad Samimi, rebut the hypotheses of Dr. Glindmeyer and thus preclude any finding of defect in the Clemco hoods.
We have reviewed all of this testimony. Although we might have decided the question differently had we been the trier of fact, under Spiegal and Ambrose we may only reverse the findings of the trier of fact where those findings are clearly wrong or manifestly erroneous. See Spiegal, 94-1252, at pp. 3-4, 650 So.2d at 745; Ambrose, 93-3099, at pp. 8-9, 639 So.2d at 221. We are not prepared to say that the jury's rejection of this testimony was either clearly wrong or manifestly erroneous.
With respect to the Clemco Model HC-1 canvas non-air fed hood, there was evidence adduced at trial that this hood provided little, if any, respiratory protection. In point of *55 fact, David Hansel, who was Clemco's corporate representative, testified that when he wore the canvas hood during actual sandblasting, dust entered the hood and that he got dust in his nose and mouth. Moreover, evidence at trial definitively established that Clemco knew that the hood provided less-than-adequate protection. An excerpt from Clemco's 1957 sales meeting in Chicago contained the following information about the canvas hood:
The oldest and most commonly used equipment is the canvas hood that slips over the head and shoulders with a draw string that can be tightened around the neck. For blasting out of doors most men prefer the canvas hood because it is light weight and offers comfortable protection where dust conditions are not too severe.
* * * * * *
These hoods do not give complete protection and as workers and contractors become more safety conscious and aware of the hazards of silicosis, we see more and more interest in the air fed type of helmet.
Furthermore, in Clemco's 1964 "Blast Off" booklet, it noted to its customers that "[m]any users still continue to use the slip-over canvas hood type of helmet. There is strong possibility that within the next few years this type of helmet will be outlawed by Federal Regulations due to its non-safe features in which the blaster is inhaling the dusty air." (emphasis added.)
Despite knowing that the canvas hood did not provide complete protection and was suitable only for outside blasting where dust conditions were not too severe, Clemco's recommended equipment lists distributed to its customers always listed the HC-1 canvas hood as a "required" hood under all blasting conditions. Clemco's General Catalog No. 7, in three different printings, listed the HC-1 as a "required hood" under intermittent duty, light usage, and major usage sandblasting. Likewise, the 1971 Equipment Lists, admitted as Plaintiff's Exhibit 90, designated the HC-1 canvas, non-air fed hood as an essential requirement for light duty, minor, medium, and major sandblasting operations.[10]
Also probative on this point is Hansel's testimony about Clemco's warning labels. According to Hansel, around 1972, Clemco began affixing warning stickers to the canvas hoods. This label indicated that the hood should be used only for light duty blasting and that it was not approved for respiratory protection.[11] Despite Clemco's knowledge that the canvas hood provided no respiratory protection and was being used improperly,[12] it continued to market the canvas hood until sometime in 1975. Although Hansel claimed that Clemco was the first company to stop distributing the canvas, non-air fed hood, Dr. Glindmeyer noted that Bullard stopped selling its canvas, non-air fed hood sometime in the 1940s or 1950s.
Based on these facts, we find that the jury could properly conclude that the Clemco and Bullard sandblasting hoods were defective due to a defect in design or manufacture or due to a lack of adequate warning. This assignment of error is without merit.

G. Clemco Assignment of Error Number 5Aggravation of Pre-Existing Injury Instruction/Quantification of Damages

1. Jury Instruction as to Aggravation of Pre-Existing Injury
Clemco submits that the trial court erred in its instructions to the jury by not submitting *56 an instruction to the jury that if Clemco proved that Young's lung condition was caused by self-induced emphysema attributable to his smoking, then it would be liable only for the degree of aggravation of his injury. As support for this argument, Clemco suggests that the jury's award of $1.5 million is so excessive as to make it clear that the jury failed to consider emphysema as a concurrent cause of Young's condition. Clemco had requested that the judge charge the jury as follows:
If a defendant's fault or neglect aggravates a pre-existing illness or injury, then the defendant is responsible to compensate the plaintiff fully for the degree of aggravation that his fault or neglect has proximately caused. But the defendant is not responsible to compensate the plaintiff for the injuries or illnesses that the plaintiff may already have had before the aggravation.
The trial court refused to give this instruction on the basis that the subject was already covered in the court's charge to the jury, in which it instructed that
[a] defendant takes his victim as he finds him and is responsible for all the natural and probable consequences of his neglect.
When the defendant's negligent action aggravates a pre-existing condition, he must compensate the victim for the full extent of this aggravation.
We again note that in reviewing a jury instruction, a small error is not necessarily prejudicial. Clement, 634 So.2d at 430 n. 6. Only where the instructions as a whole constitute manifest error will the appellate court engage in a de novo review of the record. Brown, 405 So.2d at 558.
Our review of the entirety of the jury instructions convinces us that the actual instruction given to the jury concerning pre-existing illness was sufficient. Although the wording of the instruction may not have been to the liking of Clemco, we find that the instruction adequately stated the law as applicable to the case. As noted by the court in Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091 (La.App. 5th Cir.1990), writ denied, 572 So.2d 72 (La.1991), "[i]n making his charges to a jury, a trial judge is not required to give the precise instructions submitted by either party." Id. at 1094; see also Carmen v. Gonzalez, 93-2418, p. 5 (La.App. 4th Cir. 5/17/94), 637 So.2d 1108, 1110. Rather, all the court must do is "give instructions which properly reflect the law applicable in light of the facts of the particular case." Jones, 568 So.2d at 1094. That mandate was complied with in this case.
Clemco has alleged in its brief that Young suffers solely from self-induced emphysema caused by his having smoked cigarettes during the greater part of his life. In support of this claim, they point to various pulmonary function tests performed on Young that, according to Clemco, show that he suffers from an obstructive lung disease, of which emphysema is the classic example, as opposed to a restrictive lung disease such as silicosis. We reject this argument, finding that the jury was neither clearly wrong nor manifestly erroneous in discounting this theory. Our review of the record, as required by Ambrose, convinces us that there was sufficient evidence to show that Young does in fact have silicosis and has suffered from that disease since at least 1980 or 1981. At trial, Dr. Morton Brown, who was Young's treating physician and who was accepted by the trial court as an expert in internal medicine with a specialty in occupational and pulmonary diseases, diagnosed Young as suffering from respiratory failure with secondary heart failure attributable to his work as a sandblaster. In point of fact, Dr. Brown, who treated Young continuously from 1980 until trial, diagnosed Young as suffering from silicosis as early as 1980 and maintained that Young did not develop emphysema until 1984 or 1986. His diagnosis was based on Young's occupational history, X-rays, and pulmonary function studies.
We are compelled to reject Clemco's various efforts to impugn the reliability of Dr. Brown's diagnosis. For example, the fact that Dr. Brown does not utilize International Labor Organization ("ILO") standards in interpreting X-rays does not translate into an inability on his part properly to read and interpret X-rays. It was undisputed at trial that ILO terminology is nothing more than a means to facilitate communication between *57 X-ray readers and does not bear on the underlying methodology employed by the physician during his actual reading of the X-ray.[13] Thus, this argument of Clemco is without merit, as are the other objections it raises concerning Dr. Brown's testimony.
Young was also diagnosed as having silicosis by Dr. Robert Jones, who was also accepted by the trial court as an expert in the field of internal medicine and pulmonary disease. Dr. Jones testified that in 1982, based on the patient history he took from Young, Young had an occupational history consistent with exposure to respirable free silica for a period of time sufficient to satisfy the exposure criterion for diagnosing silicosis. Furthermore, his review of Young's X-rays convinced Dr. Jones that Young did in fact have silicosis. Dr. Jones also had occasion to examine Young in September 1992, at which time he reaffirmed his diagnosis that Young suffers from complicated silicosis.
The only testimony tending to refute the claim that Young had silicosis was from Dr. Brooks Emory. Dr. Emory was called by the defense and was accepted by the trial court as an expert in internal medicine with a subspecialty in pulmonary medicine. Dr. Emory examined Young on two occasions, once in February 1981 at the behest of Aetna, one of the insurance companies then involved in the litigation and again in August of 1992. Based on the results of pulmonary tests he conducted on Young, Dr. Emory opined that Young's dominant abnormality was obstruction and impairment of air flow, tending to indicate that Young had emphysema and not silicosis. Furthermore, Dr. Emory indicated that the presence of spots in Young's lungs as shown on X-rays taken of Young in 1981 tended to be more consistent with Young's childhood in Mississippi where he could have inhaled airborne fungus leading to the pulmonary disease histoplasmosis than with silicosis. However, Dr. Emory admitted on cross-examination that it was possible for an individual to suffer from both emphysema and silicosis.
We conclude that the jury was entitled to reject Dr. Emory's opinions and to accept those of Dr. Brown and Dr. Jones. Resolution of this discrepancy is a matter vested within the vast discretion of the trier of fact and we cannot say that its conclusions are either clearly wrong or manifestly erroneous. In point of fact, under the established jurisprudence of this circuit, the jury was entitled to place greater weight on the opinions of Young's treating physicians than those of other doctors who have treated him only for purposes related to the litigation. As we stated in Pereira v. Louisiana Coca-Cola Bottling Co., 620 So.2d 315 (La.App. 4th Cir.), writ denied, 629 So.2d 414 (La.1993), "the testimony of a treating physician should be accorded more weight and probative value than that of a physician who has only seen the injured party for purposes of rendering expert testimony concerning the party's condition." Id. at 318. That rule is particularly applicable to this case, where Dr. Brown has treated Young continuously since 1981, whereas the only contrary testimony was from a doctor who had seen Young twice in an 11-year period. This assignment of error is without merit.

2. Quantification of Damages
Clemco next attacks two items of damages awarded by the jury: general damages and future medical expenses. We will discuss each of these in turn.

*58 a) General Damages

The jury awarded Young $900,000 in general damages.[14] Clemco asserts that this award is an abuse of the jury's discretion. In support of this argument, it maintains that the typical award in a silicosis case is generally $150,000 to $300,000. See W.B. Sellers v. American Optical, No. 82-3235, 729 F.2d 777 (5th Cir.1984) (award of $240,000); Byrd v. Hunt Tool Shipyards, Inc., 650 F.2d 44, 46 (5th Cir.1981) (award of $150,000); Woodward Iron Co. v. Minyard, 170 F.2d 508, 510 (5th Cir.1948) (award of $10,000); see also Cole v. Celotex Corp., 599 So.2d 1058, 1061 (La.1992) (award of $300,000 in asbestosis case); Atkinson v. Celotex Corp., 93-924 (La. App. 3d Cir. 3/2/94), 633 So.2d 383, 390-91 (award of $30,000 in asbestosis cases where plaintiff's lungs had also been adversely affected by his cigarette smoking; other awards ranging from $20,000 to $40,000).
In reviewing an award of damages, the applicable standard of review is abuse of discretion, but in weighing the award, the appellate court must look not to prior awards, but to the individual circumstances of the case. Talamo v. Shad, 619 So.2d 699, 705 (La.App. 4th Cir.), writ denied, 625 So.2d 175 (La.1993). An abuse of discretion occurs if the court was arbitrary or capricious in reaching its decision. See Torrance v. Caddo Parish Police Jury, 119 So.2d 617, 619 (La.App. 2d Cir.1960). "Capricious" means the entry of judgment with no substantial evidence to support it or a conclusion contrary to substantiated competent evidence. Coliseum Square Ass'n v. City of New Orleans, 544 So.2d 351, 360 (La.1989). "Arbitrary" implies a disregard of evidence or the proper weight thereof. Id. "The appropriate procedure for testing whether a trier of fact has abused its discretion by making an excessive award is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the fact finder." O'Brien v. Remington Arms Co., 601 So.2d 330, 337 (La.App. 2d Cir.), writ denied, 604 So.2d 1003 (La.1992).
We find that the general damages award in this case is neither clearly excessive nor an abuse of discretion. At the time of his trial, Young was 56 years old. He had worked as a sandblaster at L & M from 1967 until 1980, approximately 13 years. Dr. Brown testified that prior to Young's developing silicosis, Young had an unremarkable medical history, never having been hospitalized before. At the time of trial, Young was in extremely poor health. He required oxygen 24 hours a day and was confined to a wheelchair. He testified that on most days of the trial, he was too sick even to get out of bed and come to court.
Young has not worked since December 3, 1980, when Dr. Brown certified him as medically unable to work. Although this fact relates primarily to the question of damages for lost wages,[15] it is also probative on the issue of general damages, demonstrating just how sick Young really is. In addition, between *59 1980 and the time of trial, Young, in a departure from his prior medical history, has been hospitalized three times.
It belabors the obvious to say that silicosis is a horrible disease. Individuals who suffer from this disease die essentially from suffocation brought about by respiratory failure. It is a slow and progressive disease for which there is no known cure. Even if a person removes himself from the environment in which he was exposed to respirable free silica, this will not cure him. The silica particles have already become lodged in the lung and there is no way to counteract this process. In many respects, having silicosis is like having inoperable cancerthe victim knows that it is but a matter of time before he will die. The victim will undoubtedly suffer from a variety of pulmonary problems caused directly by having silicosis, such as "diffuse obstructive pulmonary emphysema with hypoxia (oxygen shortage), chest pain, serve dyspnea, orthopnea (particular difficult in breathing precipitated by lying down), and cyanosis (a bluish discoloration of the mucous membranes and skin due to insufficient oxygenation of the blood)." Gray and Gordy, supra, at 205A-10. The victim may also develop chronic bronchitis, pneumonia, and/or bronchiectasis ("a chronic condition characterized by destruction of muscle fibers in the bronchi and subsequent dilation of bronchi with the accumulation of secretions"). Id. The fact that Young knew that he might suffer one or all of these maladies during his unstoppable and inevitable progression towards death from total respiratory failure is highly relevant to the issue of general damages, especially those for mental suffering. Cf. Wisner v. Illinois Cent. Gulf R.R., 537 So.2d 740, 741 (La.App. 1st Cir.) (upholding testimony of plaintiff concerning his fear of developing cancer after being exposed to toxic chemicals, even though there was no evidence that he was more likely than not ever going to contract cancer), writ denied, 540 So.2d 342 (La.1989).
We are cognizant that the general damages award in this case does depart from the usual award. However, that is not the touchstone of our review. Rather, we must look to the particular circumstances of this case and interpret the evidence in a manner most favorable to the plaintiff. O'Brien, 601 So.2d at 337. Considering all of the evidence and being mindful of the fact that the jury had the opportunity to see and hear from the plaintiff, we cannot say that it abused its discretion in awarding Young general damages of $900,000. Accordingly, this assignment of error is without merit.

b) Future Medical Expenses
Clemco also complains that the jury's award of $300,000 in future medical expenses is unfounded. The standard for reviewing an award of future medical expenses was recently summarized by this court in Dixon v. Winn-Dixie Louisiana, Inc., 93-1627 (La. App. 4th Cir. 5/17/94), 638 So.2d 306, as follows:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required.
Id. at 322 (quoting Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1262 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994)). In other words, "[a]lthough the claimant is not required to prove the exact value of the necessary expenses, some evidence to support the award must be contained in the record." Id. at 323.
Clemco is correct in this assignment of error. Young introduced bills documenting $93,309.22 in past medical expenses. Although this is not necessarily indicative of Young's future medical expenses, there was an absolute dearth of testimony at trial as to what Young's future medical expenses would be. Moreover, Dr. Brown opined that Young would only survive for another year or two (although at oral argument, Young was still alive). This statement called into question the probability that Young would live long enough to incur an additional $207,000 in medical expenses. We conclude that the *60 maximum amount of future medical expenses awardable in this case was $100,000. Accordingly, we amend that portion of the judgment addressing Young's past and future medical expenses from $300,000 to $193,309.22.

H. Bullard's Assignments of Error in its Footnotes
In footnote 5 of its brief, Bullard asserts that the trial court erred in refusing to admit into evidence certain invoices documenting the sale from Tiger to Coating Specialists, Inc. of one HA-64-G hood. Apparently, this hood is similar to a number of other hoods Young alleged caused his injury. The trial court refused to admit these invoices into evidence on relevance grounds. Bullard points out, however, that Young's social security printout shows that he worked at Coating Specialists in 1972 and 1973.
Young argues that the invoices were properly excluded because Coating Specialists was not a party to the action and because a proper foundation was not laid prior to the attempted introduction of these exhibits. Young asserts that the witness who was asked to identify the invoices could not attest to their authenticity as required under La. C.E. art. 901.
Young is correct in the latter assertion. The witness through whom Bullard attempted to introduce these invoices was Manfred Nicklas, a former foreman at L & M. Bullard did not establish that Nicklas ever worked for or had any connection with Coating Specialists. Thus, it would have been impossible for him to attest to the authenticity of the invoices. See La.C.E. art. 901. Moreover, the trial court correctly noted that the invoices "cannot in any way be used as evidence to indicate that this equipment was on Land & Marine or Coastal Coatings' property." Thus, this argument is without merit.
Bullard also complains in footnote 12 of its brief that the trial court erred in excluding Young's responses to request for admissions. Bullard claims that these admissions "are highly relevant to the issue of what hood was used, the condition of the hoods used and the question of causation." Bullard alleges that the trial court did not explain its reasons for excluding the evidence.
Young counters that the trial court properly excluded them because they would have prejudiced the jury against Young by revealing that Young had settled his claims against a number of other defendants. Young points to a statement by Bullard's trial counsel that the admissions "will make a substantial difference in the thought process of these jurors because my experience tells me that a lot of people want to give money away just to help someone and be nice." Finally, Young notes that the trial court did permit cross-examination of Young concerning his responses to the Requests for Admission.
Under the balancing test of La.C.E. art. 403, this evidence was properly excluded because of the danger that it would unfairly prejudice the jury by revealing that Young had already compromised his claims against a variety of other defendants. Such evidence could have "tainted" the jury against Young and Bullard offers no persuasive reason why the evidence should have been admitted or what purpose it would have served had it been admitted. See Ducote v. Commercial Union Ins. Co., 616 So.2d 1366, 1372 (La. App. 3d Cir.), writ denied, 620 So.2d 877 (La.1993).
Ultimately, both of Bullard's arguments must fail in light of the vast discretion afforded the trial judge concerning admission of evidence. Dixon v. Winn-Dixie Louisiana, Inc., 93-1627, p. 4 (La.App. 4th Cir. 5/17/94), 638 So.2d 306, 312. A trial judge's decision to admit or exclude evidence will not be reversed on appeal absent a clear showing that it abused that discretion. Id., 638 So.2d at 312. We find no such showing with respect to either of the arguments Bullard advances.

CONCLUSION
For the foregoing reasons, we affirm the jury's conclusions that Clemco and Bullard (along with the settling defendant Loerwald) were at fault in causing Young's silicosis. However, we reverse its finding that Pulmosan was not liable for causing Young's injury. *61 Young's award for damages is adjusted as follows:

General Damages: $900,000.00
Past Lost Wages: $300,000.00
Past and Future Medical Expenses: $193,309.22
 _____________
TOTAL: $1,393,309.22

However, because Young has already compromised his claims against two of the defendants found liable in this case, Loerwald and Pulmosan, the award must be reduced by their virile shares. Therefore, we recast judgment in this case as follows:
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of plaintiff, John Young, and against defendants, E.D. Bullard Company and Clemco Industries Corporation, in solido, in the full and true sum of Six Hundred Ninety-Six Thousand Six Hundred Fifty Four and 61/100 ($696,654.61) Dollars with legal interest thereon from date of judicial demand until paid, and for costs as determined by the trial court.
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there by judgment herein in favor of defendant, Pauli & Griffin Company, and against plaintiff, John Young, dismissing all claims brought against it by the said John Young, and for costs as determined by the trial court.
NOTES
[1] The distinction between these two companies was for insurance purposes in that one company worked primarily off-shore and the other primarily on-shore. Young, however, worked for both companies, and for the sake of convenience all references to L & M in this opinion should be understood to include Coastal Coatings, unless specifically indicated otherwise.
[2] As explained by the court in Ward v. Ochoa, 284 So.2d 385 (Fla.1973),

a "Mary Carter Agreement" ... is basically a contract by which one co-defendant secretly agrees with the plaintiff that, if such defendant will proceed to defend himself in court, his own maximum liability will be diminished proportionately by increasing the liability of the other co-defendants. Secrecy is the essence of such an arrangement, because the court or jury as trier of the facts, if apprised of this, would likely weigh differently the testimony and conduct of the signing defendant as related to the non-signing defendants. By painting a gruesome testimonial picture of the other defendant's misconduct or, in some cases, by admissions against himself and the other defendants, he could diminish or eliminate his own liability by use of the secret "Mary Carter Agreement."
Id. at 387.
[3] Civil Code article 1803 provides that "[r]emission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligation." La.C.C. art. 1803. Under this article,

[a] plaintiff's release of a joint tortfeasor reduces the amount recoverable against the remaining tortfeasors by the amount of the virile (pro rata) share of the one released, since the plaintiff, in releasing a joint tortfeasor, has prejudiced the remaining tortfeasors by depriving them of their right of contribution from the one released.
Tanner v. Fireman's Fund Ins. Cos., 589 So.2d 507, 514 (La.App. 1st Cir.1991), writ denied, 590 So.2d 1207 (La.1992).
[4] According to Loerwald, "H-30-G" is a Pulmosan designation for the canvas, non-air fed hood.
[5] We are cognizant of Rosell`s admonition that "[w]here documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination." Id. at 844-45. However, after reviewing the entirety of the record, it is our considered judgment that Young's testimony was believable and that it was not "so contradicted" by the evidence as to require rejection by this Court.
[6] As to this issue, the interrogatories that the jury answered were as follows:

6-A: Did defendants prove by a preponderance of the evidence that during John Young's employment by Land & Marine and/or Coastal Coatings he used a product manufactured by Pulmosan Safety Equipment Company?
YES __X__ NO ____
If your answer to Interrogatory No. 6-A is YES, proceed to Interrogatory No. 6-B. If your answer to Interrogatory No. 6-A is NO, proceed to Interrogatory No. 7.
6-B: Did defendants prove by a preponderance of the evidence that John Young contracted silicosis as an employee of Land & Marine and/or Coastal Coatings and that a product manufactured by Pulmosan Safety Equipment was a proximate cause of this condition?
YES ____ NO __X__
[7] As was true with Pulmosan, the interrogatories that the jury answered were as follows:

7-A: Did defendants prove by a preponderance of the evidence that during John Young's employment by Land & Marine and/or Coastal Coatings he used a product manufactured by Minnesota Mining & Manufacturing Company (3M)?
YES __X__ NO ____
If your answer to Interrogatory No. 7-A is YES, proceed to Interrogatory No. 7-B. If your answer to Interrogatory No. 7-A is NO, proceed to Interrogatory No. 8.
7-B: Did defendants prove by a preponderance of the evidence that John Young contracted silicosis as an employee of Land & Marine and/or Coastal Coatings and that a product manufactured by Minnesota Mining & Manufacturing Company (3M) was a proximate cause of this condition?
YES ___ NO __X__
[8] On this issue, the jury answered the following interrogatories:

14-A: Did defendants prove by a preponderance of the evidence that Otis Logue was an executive officer of Land & Marine and/or Coastal Coatings?
YES __X__ NO ___
If your answer to Interrogatory No. 14-A is YES, proceed to Interrogatory No. 14-B. If your answer to Interrogatory No. 14-A is NO, proceed to Interrogatory No. 15.
14-B: Did defendants prove by a preponderance of the evidence that Otis Logue as an executive officer of Land & Marine and/or Coastal Coatings was negligent in that he breached a duty which he owed to John Young and such breach was a proximate cause of John Young's silicosis condition?
YES ___ NO __X__
[9] The Louisiana Supreme Court adopted Daubert as controlling under La.C.E. art. 702 in State v. Foret, 628 So.2d 1116, 1123 (La.1993). Although Daubert was decided prior to the trial of this action and Foret was not decided until almost four months after trial, Daubert controls because both it and Foret announce a procedural rule of law that must be applied retroactively. See La.C.C. art. 6 ("Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."); see also Williams v. General Motors Corp., 93-0287, p. 4 (La.App. 4th Cir. 6/15/94), 639 So.2d 275, 290 (on rehearing), writs denied, 94-1896, 94-1898 (La. 11/11/94), 644 So.2d 387, 388; Clement v. Griffin, 634 So.2d 412, 426-27 (La.App. 4th Cir.1994), writs denied, 94-0717 (La. 5/20/94), 637 So.2d 478, 479. Therefore, we apply the Daubert/Foret standard in determining whether Dr. Glindmeyer's testimony was properly admitted.
[10] We note parenthetically that the Equipment Lists also specified the PAF air fed helmet as a "required accessory" for major, medium, and minor sandblasting operations. However, the lists did not differentiate between the HC-1 hood and the PAF hood as to which one was more appropriate, leaving a reader with the distinct impression that use of either hood was appropriate under any of the listed conditions. Clearly, this is incorrect, in light of the fact that the HC-1 hood, as admitted by Clemco's corporate representative David Hansel, is intended only for light-duty, outdoor blasting.
[11] The actual language on the sticker was as follows: "This helmet is designed solely for light duty head and shoulder protection against flying abrasive particles and is NOT approved for respiratory or heavy impact protection." (emphasis in original)
[12] Clemco admits this fact in its brief on appeal, where it stated as follows: "In 1972, as Clemco became aware of extensive misuse of the canvas hood ..." (emphasis added)
[13] On cross-examination during Dr. Brown's tender, Clemco elicited the following testimony from Dr. Brown:

BY MISS LEWIS:
Q: Dr. Brown, do you know what the term ILO stands for?
A: International Labor Organization.
Q: And are you a member or are you certified in that organization?
A: Never did that membership.
Q: Couldn't you explain a little bit about what that organization does?
A: It was standards that was set up so that there could be arbitrary situations where everybody will know how to determine what they're talking about in relationship to reading an x-ray and so with people associated with dust diseases in their lungs.
Q: So, the ILO standards, the terminology, are used in cases of occupational pulmonary disease?
A: Just as a communicative link so that theoretically people could understand one another internationally what we're talking about. (emphasis added).
[14] The interrogatory answered by the jury was as follows:

17: In terms of dollars, how much in total damages did John Young sustain? (You may or may not find that John Young suffered damages in one or more of the following categories, but each blank must be filled in, either with a dollar amount or with a "0" if you find no damages for a particular category.)

1. Past, present and future physical
pain and suffering $300,000
2. Past, present and future physical
disability $300,000
3. Past, present and future mental
suffering which includes such
items as fear, anxiety and nervousness $300,000
4. Past, present and future loss of
wages and earning capacity $300,000
5. Past and future medical expenses $300,000

[15] In his brief, Young points to the testimony of Melville Wolfson, an expert economist, who testified that Young's past and future lost earnings were approximately $260,067. However, this is not an item of general damages under consideration in this assignment of error, nor does Clemco contest the propriety of this award. Therefore, it is not at issue in this appeal and will not be disturbed by this Court. More importantly, because lost wages is not an item of general damages, it should not be considered in determining whether the trier of fact abused its discretion in making a general damages award.