| EDITH CRUZ | * | NO. 2023-CA-0173 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| THE HANOVER INSURANCE | * | |
| COMPANY, MACBUZZ | | FOURTH CIRCUIT |
| ENTERPRISES, LLC D/B/A | * | |
| JIMMY JOHNS | | STATE OF LOUISIANA |
| SANDWICHES, BLUE BOILER | * * * * * * * | |
| CATS VI, LLC D/B/A JIMMY | | |
| JOHNS SANDWICHES, AND | | |
| VERONICA KING | | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2017-08267, DIVISION "N-8"
Honorable Ethel Simms Julien, Judge
* * * * * *
**Judge Karen K. Herman**
* * * * * *

(Court composed of Chief Judge Terri F. Love, Judge Sandra Cabrina Jenkins, Judge Karen K. Herman)

**JENKINS, J., CONCURS IN THE RESULT**

Marc Lloyd Frischhertz
Lloyd N. Frischhertz, Jr.
FRISCHHERTZ & IMPASTATO, L.L.C.
1140 St. Charles Avenue
New Orleans, LA 70130

      COUNSEL FOR PLAINTIFF/APPELLEE

Sidney J. Angelle
Erik L. Vollenweider
LOBMAN CARNAHAN BATT ANGELLE & NADER
400 Poydras Street
Suite 2300
New Orleans, LA 70130

      COUNSEL FOR DEFENDANTS/APPELLANTS

**AFFIRMED**
**JANUARY 10, 2024**

Appellants-Defendants, the Hanover Insurance Company and Blue Boiler Cats, II, LLC ("Defendants"), appeal the December 13, 2022 judgment that was rendered in accordance with the jury's verdict in favor of Appellee-Plaintiff, Edith Cruz ("Plaintiff") and found Defendants liable for the injuries sustained by Plaintiff. For the following reasons, the trial court's judgment is affirmed.

**FACTS AND PROCEDURAL HISTORY**

This lawsuit stems from an incident that occurred on September 6, 2016, on Maple Street in New Orleans, Louisiana. According to the petition, Plaintiff walked onto the sidewalk in front of her salon when an unknown

male Jimmy John's delivery cyclist struck her with his bicycle. The cyclist fled the scene.

As a result of the injuries sustained, on August 25, 2017, Plaintiff filed suit against Blue Boiler Cats, II, LLC, d/b/a, Jimmy John's Sandwiches,[1] who operates the Jimmy John's sandwich shop on Maple Street; Hanover Insurance Company, its insurer; Veronica King ("King"), the assistant manager of the Jimmy John's Maple Street location; and the unknown cyclist. Plaintiff alleges that at the time the cyclist struck her, he was in the course and scope of his employment with Jimmy John's.

The matter proceeded to jury trial on November 29, 2022. The following testimony was adduced at trial.

King, the assistant manager of Jimmy John's at the time of the incident, testified that there were approximately ten to fifteen bicycle delivery persons or "drivers"[2] at the Maple Street location of Jimmy John's. She stated that part of her duties as an assistant manager was to ensure the cyclists followed the "rules of the road," which included making sure the delivery drivers wore helmets and bicycled the proper direction down the

---

[1] The case caption lists Blue Boiler Cats VI, LLC, as a defendant. The answer filed by Defendants, however, shows that the operator of Jimmy John's is Blue Boiler Cats, II, LLC and it was improperly named Blue Boiler Cats, IV, LLC, in the petition.

[2] Throughout the trial, the witnesses sometimes referred to Jimmy John's delivery cyclists as drivers.

3

street.  She stated that delivery cyclists parked their bikes on racks on the side of the store or on the front porch near the store entrance. King testified that cyclists often drove on the sidewalk when returning to the store, but not when leaving the store with deliveries. She explained that there is a driveway in front of the store so the delivery persons "would have to come up on the sidewalk to get to the store." King testified that when the cyclists would leave the store to make deliveries, they would turn right towards Adams Street and that they never rode in front of Plaintiff's business. She stated that the cyclists "never left left." King also stated that the Jimmy John's drivers would walk the bikes on the sidewalk before getting to the street. She admitted that she did not follow the delivery drivers once they left the store but advised the drivers "if they go left, they would have to walk the bikes" and "[i]f they go right, they can walk or ride the bikes the way the street travels."

King stated that prior to the incident, Plaintiff called the police on several occasions to complain that the Jimmy John's delivery drivers were riding their bikes on the sidewalk. She testified that Plaintiff also placed signs on her store front directing Jimmy John's drivers to stay off the sidewalk. She also stated that Plaintiff verbally attacked the drivers about riding on the sidewalk. King stated that as a result of Plaintiff's complaints,

4

she and the manager of the Jimmy John's, Raymond Baker ("Baker"), created a cyclist agreement, which consisted of Louisiana cycling laws and ordinances, for the drivers to sign.

King testified that she learned about the September 6, 2016 incident when two police officers came into the store. She stated she spoke with the police another time and that the "older officers" described the driver as wearing a "black shirt with Disney cartoon characters on the front" and a black backpack. Later, when questioned again about her conversation with the police a week after the incident, body-cam video of Officer Paul Micken, was played for the jury. In the video, contrary to the assertion of King, Officer Micken states that Plaintiff described the cyclist as wearing a black shirt.[3]

Baker testified that when they hired drivers for Jimmy John's, the drivers were encouraged to follow the traffic laws. He testified that Plaintiff had made complaints of the drivers riding on the sidewalk. Baker did not consult with his supervisors before creating the cycling agreement. He testified that the drivers could either wear a black Jimmy John's tee-shirt, with a small logo in the front and large logo on the back, or, if the driver paid for it, a red, white, and black mesh cycling jersey. Baker said some of

_____

[3] Additional content of the video will be addressed later herein.

the drivers wore cycling caps and had backpacks. He stated that a Jimmy John's driver must wear a helmet.

Upon review of the Jimmy John's driver run report on the day of the incident, Baker testified that multiple drivers, including John Bouwsma ("Bouwsma"), Tyler Lamaide ("Lamaide"), Hugo Latourelle, Kevin Leonard, and Rishav Acharya, left with delivery orders from 4:40 p.m. to 5:08 p.m. A daily audit trial also documented the orders, including one by Lamaide, that were late for delivery.

Baker was shown the video of the incident, taken from a security camera across the street. The video of the incident depicts a person, wearing a black shirt, shorts, and either a black hat or helmet, mounting a bike in front of Jimmy John's ride down the sidewalk and strike Plaintiff. Plaintiff falls and the cyclist rides off. [4]

Upon review of the video, Baker admitted that it appears that the person who struck Plaintiff "came out of Jimmy John's" and "retrieved a bicycle from the front of the Jimmy John's store." He stated that the man appears to be white and tall. Baker testified that if the person who hit Plaintiff was not an employee of Jimmy John's, it was likely a customer

---

[4] The Jimmy John's company name is not visible on the building in the video. However, based on the testimony and evidence in the record, it is appears that the cyclist is in front of Jimmy John's restaurant.

leaving the store. He noted that customers were also permitted to park their bikes in the front of the store.

Baker testified that he spoke with Plaintiff about the incident and that she indicated that a Jimmy John's employee had run into her. He estimated that Plaintiff was struck between 4:00 p.m. and 4:30 p.m. Baker acknowledged that in a prior deposition, he had stated that the incident occurred between 4:00 p.m. and 5:00 p.m. He testified that when the police officers advised him of the September 6, 2016 incident, one of the officers indicated that Plaintiff "had changed her story so much that they weren't even going to file a report."

Logan Peeler ("Peeler"), a driver of Jimmy John's for two years, testified that he worked for the company in September of 2016, but was not working the day of the accident. He stated that the drivers were provided two black Jimmy John's shirts and could purchase a jersey. He said the shorts had to be khaki or black and that drivers had to wear a bicycle helmet. He stated that the drivers wore backpacks to deliver the sandwiches and that it would have obscured the logo or slogan on the back of the Jimmy John's shirt.

Peeler testified while he worked there delivery drivers would ride their bicycles on the sidewalk "daily." He noted that sometimes the drivers

would walk their bikes but they would also ride them on the sidewalk to get to the street. Peeler stated that he first learned about the incident when he observed Plaintiff with a wrist brace on and she advised him that a Jimmy John's cyclist had hit her.

Randolph Spitler ("Spitler"), a hairdresser and acquaintance of Plaintiff, testified that once Jimmy John's opened up, he observed Jimmy John's cyclists riding on the sidewalk past Plaintiff's salon. He stated that the drivers wore black or red shirts. Spitler could not observe any visible logos when they wore the black shirts as they rode past him. He stated that Plaintiff made complaints regarding the driver riding on the sidewalk. Spitler stated he never observed other cyclists, aside from Jimmy John's employees, using the sidewalk on Maple Street to ride their bikes.

Shirley McNamara ("McNamara"), a barber and Plaintiff's co-worker at the salon, testified that she had witnessed the Jimmy John's delivery people "whizzing up and down" the sidewalk on Maple Street "almost every day." McNamara stated that the manner in which the delivery drivers rode their bikes presented a problem and she would often shout at them to "get on the street" or to "slow down." She mostly observed the delivery drivers in black shirts and could not see any logos on the shirts because they "always

had a backpack on for the most part." McNamara noted that Plaintiff complained to Jimmy John's about the cyclists riding on the sidewalk.

McNamara testified she was cutting a client's hair at the time of the incident. She stated that two kids and their father came into the salon "close to 4:30" p.m. McNamara admitted in a prior deposition that she testified that the hair appointment was "around 4:00, 4:30 roughly." She testified that the time of the appointment was likely closer to 4:30 p.m. because the father had to pick up his kids from daycare prior to the appointment.

McNamara testified that during the hair appointment Plaintiff exited the salon to retrieve mail. When Plaintiff returned, she was upset, holding her arm, and stated: "the idiot just hit me on his bike." McNamara stated when Plaintiff reentered the salon, she had already cut the kids' hair, which took fifteen to twenty minutes each, and was cutting the father's hair. She estimated that Plaintiff had come back into the salon between 5:00 and 5:15 p.m.

Lamaide, a driver for Jimmy John's on the day of the incident, testified via his video deposition that was played for the jury. Lamaide stated that the majority of orders from the Jimmy John's location on Maple Street were to the Loyola/Tulane University area. He testified if a delivery driver

wanted to head towards the universities down Maple Street, the driver would be going against traffic.

Lamaide recalled signing a cyclist agreement. He stated the delivery drivers wore either a black shirt or a red jersey. Lamaide testified that he could not remember if the delivery drivers would ride down Maple Street on the sidewalk. When shown his prior deposition testimony, Lamaide noted that he previously stated that drivers sometimes would not follow "the rule" "that you're not supposed to ride your bicycle on the sidewalk." He also could not recall if delivery drivers would ride the wrong way down Maple Street on the sidewalk "daily." Lamaide, however, recognized that in his previous deposition he agreed with Peeler and Bouwsma's statement that "bicyclists would ride on the sidewalk on a daily basis." Lamaide testified that when he was making deliveries he would walk his bike down the sidewalk to the corner of Maple Street before riding it.

Upon viewing the Jimmy John's attendance sheet, Lamaide acknowledged that on the day of the incident, he worked from 10:00 a.m. until 2:00 p.m. and returned at 4:59 p.m. He admitted that the daily audit trial and driver run report showed that he left the store at 5:00 p.m. with an order that was marked "late delivery." He also stated that he had shorter hair

10

in September 2016 and that he did not wear his hair in a ponytail. Lamaide stated that he wore a backpack when he made his deliveries.

Lamaide stated that he remembered a woman at a salon, Plaintiff, who complained frequently about Jimmy John's drivers riding on the sidewalk. He stated that Plaintiff would "yell at everyone on bikes." He stated he was a "little annoyed" at Plaintiff for yelling at cyclists. He denied ever patronizing her salon. Lamaide was then shown an online review authored by "tyler lamaide" that gave Plaintiff's salon one star and stated that the "owner has a vendetta" against "bikers."[5] He stated that he did not "remember making the post" but did not deny making it. Lamaide stated that he was not the cyclist that ran into Plaintiff. He noted in a prior deposition, he stated "I think I would remember hitting someone."

Plaintiff testified once Jimmy John's opened on Maple Street she observed delivery cyclists riding on sidewalks and going the wrong way on the streets. She stated that this happened "daily" and "hourly." Plaintiff said she made complaints about the drivers to Jimmy John's management at the Maple Street location as well as the corporate entity. She stated that she also

---

[5] The name displayed on the review was all in lower case letters. In the deposition of Lamaide and in the appellee brief, counsel for Plaintiff refers to the review as a Facebook review. However, Plaintiff testified at trial that it was a Google review.

11

told the drivers to "get off the sidewalk" and called the police on three occasions to report "their illegal behavior of riding the wrong way on sidewalks."

Plaintiff stated on September 6, 2016, toward the end of her day, she walked outside the salon to check the mail. After she retrieved her mail, she turned to face Maple street, took one step onto the sidewalk, and a bicycle hit her and knocked her to the ground. She was fifty-five years old at the time of the incident. Plaintiff stated that the cyclist did not offer her help and said "F you b*tch" and took off down Maple Street. She testified that when she reentered the salon McNamara was still cutting a client's hair and she told her that she had been hurt. Plaintiff stated that McNamara's hair appointment started at 4:30 p.m.

Plaintiff testified that she then went to Jimmy John's and asked which delivery driver had left, but the employees just stared at her. She stated that she knew it was a Jimmy John's driver that struck her based on the uniform. Later, she approached two police officers that were parked nearby and advised them of the incident.

Plaintiff stated that a couple of days after the incident she obtained surveillance video from T.J. Quill's, a bar across the street from the salon. She reported the incident to the police and informed them that the delivery

person that struck her had a dark shirt, a cap, shorts, short dark hair, and a backpack. Plaintiff admitted that at one point she testified that the cyclist had a long ponytail.

Plaintiff testified that on September 24, 2016, she was notified of a one-star negative review on social media of her salon posted by a Tyler Lamaide. The review stated "owner has a vendetta again to [sic] bikers." She stated that a person named Tyler Lamaide had never set foot in her salon.[6]

On cross-examination, Plaintiff estimated that the incident occurred between 4:00 p.m. and 5:00 p.m. She conceded upon review of a police interview that she told the police officer that the incident happened around 4:20 to 4:30 p.m. She also admitted that on a patient information form for medical treatment, she estimated that the incident occurred between 4:00 p.m. and 4:30 p.m. Plaintiff explained that the estimate she provided on the form and the police must have been wrong because McNamara had a client appointment at 4:30 p.m. and that she was struck after the client had arrived. She also said she could not be "certain of the time" of the incident.

---

[6] Plaintiff also testified regarding Facebook posts she authored about the incident and the effects of the incident on her business. This testimony as well as specific comments to Plaintiff's Facebook posts will be addressed later herein.

Plaintiff admitted that she did not observe any Jimmy John's logos on the cyclist that struck her. She testified multiple times that she did not see the face of the driver who hit her but that she was confident it was a Jimmy John's delivery person. Plaintiff also testified that she had seen the delivery driver earlier that day between 11:00 a.m. and 1:00 p.m.

When asked about her statement that the cyclist had a ponytail, Plaintiff stated: "I remember hair in the back, and I do remember stating the word 'ponytail'" but "it was short too. I mixed up on that." She testified that she remembered "hair at the collar-ish line, and … it kind of resembled a ponytail, but I can't be exactly sure it was or not, but I do remember saying it, yes."

Plaintiff said she ran into Peeler a few days after the incident at Redd's bar on Maple Street. Peeler showed a few photographs of Jimmy John's employees and wrote down the name Javier Zapata ("Zapata") on a piece of paper. She also stated that on another occasion Jimmy John's personnel presented Zapata's name and picture to her in the salon. Plaintiff learned Zapata was an in-store employee of Jimmy John's, not a delivery driver.

Bouwsma testified via a video deposition. He denied being the driver who struck Plaintiff on September 6, 2016. Bouwsma testified, upon

14

reviewing the surveillance video of the incident, that the person who hit Plaintiff was taller. He also stated that he wore the red jersey every day. He agreed that the time sheet records showed that he worked from 11:29 a.m. to 5:10 p.m. on the day of the incident. He stated it was common for delivery drivers to take the sidewalk to the corner of Maple Street.

Witness testimony concluded on December 6, 2022, and on December 7, 2022, the jury rendered a verdict in favor of Plaintiff. On December 13, 2022, the trial court rendered a judgment in accordance with the jury's verdict, finding Defendants liable for Plaintiff's injuries.[7]

Defendants' timely appeal followed.

**APPLICABLE LAW AND DISCUSSION**

Defendants set forth the following assignments of error: (1) the trial court erred in permitting the body worn camera video of Officer Micken into evidence because it was inadmissible hearsay and hearsay within hearsay; (2) the trial court erred in excluding certain portions of Plaintiff's Facebook page "from being entered into the record and read to the jury as that exhibit had already been accepted into the record in its entirety;" (3) the trial court

---

[7] At the conclusion of trial and prior to jury deliberation, Defendants moved for a directed verdict, requesting that the claims against King be dismissed with prejudice. The trial court granted the motion for directed verdict. The December 13, 2022 judgment reflects that ruling.

15

erred in allowing the review of "tyler lamaide" of Plaintiff's salon into evidence as it lacked authentication and a proper foundation; (4) the trial court erred in removing comparative fault line from the jury verdict form as Defendants had presented sufficient evidence that Plaintiff had extensive awareness of the potential danger of cyclists riding on the sidewalk in front of her salon.

Evidentiary Rulings

"A trial court has vast discretion in evidentiary matters" and "[a]s such, evidentiary rulings will not be disturbed on appeal absent a clear abuse of discretion." *Roberts v. Boxer*, 2019-1038, p. 3 (La. App. 4 Cir. 11/18/20), 311 So.3d 513, 517 (citing *Yokum v. Funky 544 Rhythm and Blues Cafe*, 2016-1142, p. 22 (La. App. 4 Cir. 5/23/18), 248 So.3d 723, 740); *see also Freeman v. Phillips 66 Co.*, 2016-0247, p. 4 (La. App. 4 Cir. 12/21/16), 208 So.3d 437, 441. Defendants maintain, however, the trial court's rulings are subject to *de novo* review. This Court has acknowledged that "[w]hen a legal error is made, the appellate court will set aside the jury's verdict and make an independent determination of the facts from the record without according any weight whatsoever to the factual findings of the tainted jury." *Freeman*, 2016-0247, p. 4, 208 So.3d at 441 (quoting *Roger v. Dufrene*, 97–1946, pp. 3–4 (La. App. 4 Cir. 9/9/98), 718 So.2d 592, 595).

16

Under La. C.E. art. 103 "error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected." *Freeman*, 2016-0247, p. 5, 208 So.3d at 441 (citing *Roger,* 1997-1946, p. 6, 718 So.2d at 596). "The proper inquiry for determining whether a party was prejudiced by a trial court's alleged erroneous ruling is whether the alleged error, when compared to the entire record, had a 'substantial effect' on the outcome of the case." *Id*. (quoting *Roger*, 1997-1946, p. 6, 718 So.2d at 596). "The party alleging prejudice from the trial court's evidentiary ruling bears the burden of proof." *Id*. at p. 5, 208 So.3d at 441-42 (citing *Thomas v. A.P. Green Indus., Inc*., 2005-1064, p. 32 (La. App. 4 Cir. 5/31/06), 933 So.2d 843, 865).

*Body-Cam Video of Officer Micken*

Defendants argue it was error for the trial court to permit Officer Micken's body-cam video into evidence as it constitutes hearsay and hearsay within hearsay because Officer Micken did not testify at trial.

Hearsay is "an oral or written assertion," "other than one made by the declarant while testifying at the trial or hearing, that is offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(A)(1),(C). Hearsay is inadmissible "except as otherwise provided by this Code or other legislation." La. C.E. art. 802.

Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability. *Trascher v. Territo*, 2011-2093, p. 8 (La. 5/8/12), 89 So.3d 357, 364 (citing *State v. Brown,* 562 So.2d 868, 877 (La. 1990); *State v. Martin,* 458 So.2d 454 (La. 1984)). However, when an extrajudicial declaration or statement is offered for a purpose other than to establish the truth of the assertion, its evidentiary value is not dependent upon the credibility of the out-of-court asserter and the declaration or statement falls outside the scope of the hearsay exclusionary rule. *Id*

Hearsay within hearsay or "double hearsay" is a "hearsay statement within a hearsay statement." 19 La. Civ. L. Treatise, Evidence And Proof § 10.29 (2d ed.). "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided by legislation." La. C.E. art. 805. *See also State v. Landrieu*, 2018-0964, p. 17 (La. App. 4 Cir. 6/12/19), 274 So.3d 661, 673 ("when a statement sought to be introduced contains multiple levels of hearsay, each separate level of hearsay must meet its own exception").

18

The body-cam video, taken approximately a week after the accident, depicts Officer Micken speaking to King. Officer Micken stated that Plaintiff described the cyclist as a tall white guy with short black hair and black shirt. He noted that in the security video the tortfeasor was also wearing a black hat. King conceded that Jimmy John's drivers wear one of two black hats.

Defendants claim that Officer Micken's comments to King regarding the alleged tortfeasor is hearsay and Officer Micken's description of the alleged tortfeasor based on Plaintiff's statement is double hearsay. [8] Defendants further argue that the admission of this video is not harmless error because it was played and/or referenced several times during the jury trial. Defendants claim that the video was referenced by Plaintiff in closing and note that the jury asked to view the video prior to deliberating.

---

[8] Defendants cite *Bradley v. Safeway Ins. Co. of Louisiana*, 2008-1188, pp. 6-7 (La. App. 4 Cir. 5/6/09), 17 So.3d 1, 4–5, to support their arguments. This Court found that testimony of vehicle driver and vehicle owner that they learned the identity of other driver involved in rear-end collision after providing police officer with license plate number was inadmissible hearsay, in driver's and owner's action against alleged other vehicle's insurer to recover damages sustained in the accident, though counsel did not specifically ask what the officer said; statement was offered to prove the truth of the matter asserted, officer did not testify at trial, and testimony was not based on personal knowledge.

19

Defendants thus contend that the video was prejudicial and affects their substantive right as they were not able to cross-examine Officer Micken.

Plaintiff, however, contends that the video was properly admitted into evidence under La. C.E. art. 607, which permits the credibility of a witness to be impeached by contradicting evidence. The article provides:

> **A. Who may attack credibility.** The credibility of a witness may be attacked by any party, including the party calling him.
>
> **B. Time for attacking and supporting credibility.** The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
>
> **C. Attacking credibility intrinsically.** Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
>
> **D. Attacking credibility extrinsically.** Except as otherwise provided by legislation:
>
> (1) Extrinsic evidence to show a witness' bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
>
> (2) Other extrinsic evidence, *including prior inconsistent statements and evidence contradicting the witness' testimony, is admissible when offered solely to attack the credibility of a witness* unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.

(emphasis added); *see also* Cmt. (o) to La. C.E. art. 607 (stating that "Paragraph D is not intended to change the broad, traditional policy, based on waiver and fair play, permitting freer admissibility of extrinsic evidence to counter a witness' testimony after an adverse party has 'opened the door' to otherwise inadmissible evidence"); *see also State v. Manning*, 2003-1982, p. 59 (La. 10/19/04), 885 So.2d 1044, 1097) (citing cmt. (o) and noting that a party may open the door to otherwise prohibited testimony).

Plaintiff argues that King "opened the door" to admissibility of the body-cam video when King testified about what the police officer said "Mrs. Cruz told him about the description of the biker who struck her." *State v. Juniors*, 2003-2425, p. 52 (La. 6/29/05), 915 So.2d 291, 330 (finding that the trial court abused its discretion by declining to admit a handwritten letter drafted by the co-defendant to impeach the co-defendant's credibility after he denied he had written letter).[9]

At trial, King testified that she first learned of the September 6, 2016 incident when two officers came into the store. When questioned by Plaintiff's counsel about whether the police came by the store another time to "follow up" after the initial conversation, King testified:

_____

[9] The *Juniors* Court, however, ultimately found that the trial court's error in excluding the letter did not provide grounds for reversing the defendant's conviction where the evidence and testimony presented by the other witnesses presented overwhelming evidence in support of guilt. *Juniors*, 2003-2425, p. 54-55, 915 So.2d at 331.

The older officer came in, and he gave me a description of the driver. And he told me that the driver was wearing a black shirt with Disney cartoon characters on the front and had a black backpack, and he was headed toward where Redd's, the bar. I think that's the name of it. It's a bar. It's located on the left corner of Jimmy John's. He said -- he give him a description, and I told him that wasn't our driver. And he told me himself: Well, if that wasn't your driver, it's nothing we can do.

Later, Plaintiff's counsel again asked King about the interactions with police after the incident and indicated he intended to show the body-cam footage. Defense counsel objected but the trial court allowed the video to be played for the jury. The transcript provides:

[MR. CARTER, Plaintiff's counsel] Q. Let me back all the way up and ask a clear question.

Following the accident, Ms. Cruz's accident, you testified that you spoke to the police about the accident?

A. Yes.

Q. Do you recall whether or not the police officers were Black or White?

A. There were two Black police officers.

Q. There's two Black police officers. Do you recall having a conversation with that police officer in the store about the accident?

A. Yes.

MR. CARTER:

Your Honor, I'm going to show the video of the interview of Ms. King and the body camera footage

22

MR. VOLLENWEIDER [Defense counsel]:

Your Honor, we're going to object to that exhibit. Ask for a sidebar. (Whereupon a bench conference was held.)

THE COURT:

The Court overrules the objection. Counsel, you may proceed.

MR. CARTER:

Thank you, Your Honor.

BY MR. CARTER:

Q. Ms. King, you testified earlier that the police visited you on the day of Ms. Cruz's accident, correct?

A. Yes.

Q. And then they also visited you a week after the accident, correct?

A. Yes.

Q. Okay. Let me show you body camera footage from the police interview of you taken a week after the accident. I'm going to show this and see if we could get it to play loudly and make sure there are no technological issues. (Whereupon video footage was played before the jury.)

Were you able to see that entire video from where you were?

A. Yes.

Q. And throughout that whole conversation with the police officers, did you go -- you're an assistant manager at that time?

A. Yes.

23

Q. And part of your job was to make certain that the rules were followed, correct?

A. Yes.

Plaintiff's argument that the intent of offering the body-cam video was to impeach King's testimony is persuasive. King testified that the officer advised her that Plaintiff described the cyclist as wearing a shirt with Disney characters on it. The body-cam video, wherein Officer Micken stated Plaintiff described the cyclist as wearing a black shirt, conflicts with King's trial testimony. Once King testified about the contents of her conversation with the police officers and of what the officers relayed to her about Plaintiff's description of the driver, Plaintiff was allowed to introduce the body-cam video to challenge the credibility of King's statement.

In their reply brief, Defendants suggest that the body-cam video is not impeachment evidence. Defendants note that body-cam footage was recorded on September 13, 2016, and that "Plaintiff erroneously claims that this impeaches" testimony about King's conversation with police "who came to the store on September 6, 2016." However, it is clear in the transcript that the video was taken a week after the accident and not the day of the incident. As described above, prior to body-cam video being played for the jury, Plaintiff's counsel asked King if the police "visited [her] a week after the accident." When King replied in the affirmative, Plaintiff's counsel advised

24

he was going to "show [] body camera footage from the police interview [] taken a week after the accident."

Because King offered testimony of what the police officer told her, Plaintiff was permitted to present the body-cam video of Officer Micken contradicting King's testimony. The trial court did not abuse it discretion in allowing the body-cam footage into evidence.

Moreover, the admission of the video was harmless error. "An error is harmless when the error is surely unattributable to the verdict." *Lovecchio v. Romain*, 2019-0779, p. 12 (La. App. 4 Cir. 3/25/20), 364 So.3d 202, 211 (quoting *Levy v. Lewis*, 2016-0551, p. 19 (La. App. 4 Cir. 5/17/17), 219 So.3d 1150, 1162); *see also State v. Santiago*, 2022-0607, p. 9 (La. App. 4 Cir. 3/7/23), 359 So. 3d 540, 547.

The record shows that any error on the part of the trial court is surely unattributable to the verdict. Peeler, Bouswama, and Lamaide, who were previously delivery cyclists at Jimmy John's, acknowledged that the Jimmy John's drivers would regularly ride their bikes on the sidewalk against the traffic flow of Maple Street. Plaintiff, McNamara, and Spitler, also indicated that Jimmy John's delivery cyclists would "whiz" down the sidewalk in front of Plaintiff's salon. The testimony also established that Jimmy John's drivers wore black shirts and black hats and that the

25

backpacks the drivers wore obscured the Jimmy John's logo, which was consistent with Plaintiff's description.   Moreover, the surveillance video also shows a man, wearing a black shirt and backpack, get on a bike in front Jimmy John's and hit Plaintiff on the sidewalk.  Additionally, the Jimmy John's records indicated that multiple Jimmy John's cyclists were out on delivery near the time of the incident.  The jury's finding of liability against Defendants is not attributable to the trial court's decision to permit the body-cam footage of Officer Micken into evidence.  This assignment of error lacks merit.

*Portion of Facebook Page*

Defendants argue that the trial court erred in excluding a Facebook comment from Virginia Lovell ("Lovell") from the record.

During direct examination, Plaintiff read a few of her Facebook posts, including one, dated November 26, 2016, that discussed the incident at issue:

> On September 6th, I was hit by a cyclist on the sidewalk in front of my shop at a high speed. Since then I have seen several doctors and have also been going to a chiropractor two or three times a week. Before the accident, I would work eight to 11 hours a day. And now just after two clients, my neck and shoulders is killing me. I can hardly work anymore. I'm on the verge of financial disaster. If I don't get relief soon, I'm going to lose my -- I'm going to lose my business. I'm not going to be able to pay any of my bills, which I am already behind. I have faith that the party responsible for my injury will be brought to

26

justice. But until then, I don't know what I'm going to do. I have never been in such a bad position. I'm so angry, depressed, scared. I never needed prayers like I do now.

On cross-examination of Plaintiff, Defendants asked her to read a comment by Lovell. Plaintiff's counsel objected as "irrelevant, immaterial." Plaintiff's counsel further noted, "It's a comment to a social media post that's never recognized, responded to by her at all." Counsel for defense noted, however, the Facebook page was "already in evidence" and Plaintiff's objection thereto had been waived. The record does not reflect the trial court's ruling but Plaintiff was not permitted to testify as the Facebook comment.

According to Defendants, the Facebook comment on Plaintiff's page, authored by Lovell, provided "Do you know who did it? I hope you have a good lawyer and he/she is insured. Prayers coming your way." This comment is redacted from the exhibit contained in the record for appeal.

Defendants claim that because Plaintiff's Facebook page was previously admitted without objection and because Lovell's comment "highlight[s] the defense's position" that Plaintiff did not know it was a Jimmy John's employee who hit her on the day of the incident, it was not a harmless error.

However, the comment was not replied to and does not actually offer proof of what Plaintiff knew at the time of the accident. This evidence is thus irrelevant. *See* La. C.E. art. 401 (providing that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Moreover, given the substance of the comment, any error in failing to admit the comment is harmless.

As stated above, multiple witnesses testified that the Jimmy John's cyclists wore black shirts and black hats and that they often rode their bikes on the sidewalks. The surveillance video of the incident also shows a cyclist mount a bike near Jimmy John's and collide with Plaintiff on the sidewalk near the salon. Further, the records and testimony show that several cyclists were making deliveries near the time Plaintiff was injured. The trial court's refusal to allow the Facebook comment into evidence is surely unattributable to the jury's verdict. This assignment of error lacks merit.

*Review of Plaintiff's Salon*

Defendants argue the trial court erred in allowing the online review by "tyler lamaide" of Plaintiff's salon into evidence.

The one star review at issue, posted on September 24, 2016, stated "Owner has vendetta again [sic] to [sic] bikers." At trial, Defendants objected to the admission of the review based on hearsay as well as lack of foundation. In its brief, Defendants claim that Plaintiff failed to lay the proper foundation to permit the review into evidence.

Authentication of evidence is required in order for evidence to be admissible at trial. *See Archaga v. Johnson*, 2019-85, p. 12 (La. App. 5 Cir. 10/16/19), 280 So.3d 331, 337. Regarding authentication, the Louisiana Code of Evidence states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *Jones v. Boot Bar & Grill,* 2022-0154, pp. 20-21 (La. App. 4 Cir. 10/5/22), 350 So.3d 968, 983, *writ denied*, 2022-01639 (La. 1/18/23), 353 So.3d 728 (quoting La. C.E. art. 901(A)). La. C.E. art. 901(B) provides an illustrative, though not exhaustive, list of examples of authentication or identification of evidence. *Carrie v. Jones*, 2021-0659, p. 7 (La. App. 4 Cir. 1/21/22), 334 So.3d 834, 841. Such evidence may come in the form of testimony by a witness with knowledge that the matter is what it is asserted to be; indications of the item's distinctive characteristics, including its contents, substance, internal patterns, and other distinctive

characteristics; or evidence describing the process or system used to produce the item and showing that the process or system produces an accurate result. *See* La. C.E. art. 901(B)(1),(4),(9).

Defendants argue that there was nothing submitted by Plaintiff to lay the foundation that the purported review is what Plaintiff claims nor evidence to support the legitimacy of the document nor attribute this review to Lamaide.

Plaintiff, however, argues that the review was admissible because La. C.E. art. 901 provides that authentication is satisfied by any evidence sufficient to support a finding that the matter is what its proponent claims and that testimony of subscribing witness is not necessary to authenticate a writing. Moreover, Plaintiff notes that Lamaide testified that Plaintiff yelled at cyclists and that it annoyed him. Plaintiff further notes that Lamaide acknowledged the review though he did not remember making the post.

In his testimony, Lamaide "recalled" the "salon lady" yelling at "everyone" riding bicycles. He could not remember if Plaintiff had yelled at "bikers" for "any other reason than riding on the sidewalk in front of her salon." Lamaide denied becoming "agitated or angry" but agreed that he was a "little annoyed" when Plaintiff would yell at the cyclists. He denied

30

patronizing Plaintiff's salon but then referenced the online review. The transcript provides:

> [Plaintiff's Counsel] Q. Well, did you ever patronize her salon, get your hair cut there?
>
> [Lamaide] A. No. I know what you're going towards. This is for the comment that I had made on her thing. I don't remember making it. I don't know the context around it.

Lamaide was then showed the review wherein "a Tyler Lamaide" posted a one star review on Plaintiff's business page. He then stated "I don't remember making the post. I'm not saying I didn't make the post. I just don't remember making it." Lamaide also stated he did not know of "any other Tyler Lamaide" who had issue with Plaintiff's complaints about cyclists.

Lamaide established foundation of the admissibility of the online review when he admitted to the existence of the "comment" that he "had made on [Plaintiff's] thing." Moreover, similar to when King testified about the police officer's statements, Lamaide opened the door for Plaintiff to present the online review, when he mentioned the review in response to Plaintiff's counsel questioning.

Moreover, even if the evidence was not properly introduced, the information gleaned from the online review was cumulative. As noted above, Lamaide testified that Plaintiff yelled at cyclists and that this had

31

annoyed him. The online review was consistent with the testimony Lamaide had already provided. Because the review just corroborated Lamaide's testimony, any error on the part of the trial court in allowing the "tyler lamaide" review into evidence is harmless. This assignment of error also lacks merit.

Jury Verdict Form

Jury interrogatories or forms are reviewed under a manifest error standard of review. *See Danna v. Ritz-Carlton Hotel Co., L.L.C.,* 2020-0116, p. 22 (La. App. 4 Cir. 3/24/21), 365 So.3d 679, 696 (citing *Young v. Logue*, 1994-0585, p. 23 (La. App. 4 Cir. 5/16/95), 660 So.2d 32, 48). Jury interrogatories must fairly and reasonably point out the issues to guide the jury in reaching an appropriate verdict. *Marchetta ex rel. Marchetta v. CPC of Louisiana, Inc.*, 1999-0485, p. 5 (La. App. 4 Cir. 3/22/00), 759 So.2d 151, 154 (quoting *Guidry v. Bank of LaPlac*e, 94–1758, pp. 3–4, (La. App. 4 Cir. 9/15/95), 661 So.2d 1052, 1055). "If the trial court submits a verdict form to the jury with misleading or confusing interrogatories … such interrogatories do not adequately set forth the issues to be decided by the jury and may constitute reversible error." *Duvio v. Specialty Pools Co., LLC,* 2015-0423, pp. 21-22 (La. App. 4 Cir. 6/16/16), 216 So.3d 999, 1014 (quoting *Provosty v. ARC Constr., LLC.,* 2012–1015, p. 12 (La. App. 4 Cir. 3/20/13), 119

So.3d 23, 32). "The verdict form may not be set aside unless the form is 'so inadequate or incorrect as to preclude the jury from reaching a verdict based on the law and the facts.'" *Danna*, 2020-0116, p. 22, 365 So.3d at 696–97 (quoting *Young*, 1994-0585, p. 23, 660 So.2d at 48).

Moreover, this Court in *Chicago Prop. Ints., L.L.C. v. Broussard,* 2015-0299, pp. 6-7 (La. App. 4 Cir. 10/21/15), 177 So.3d 1074, 1079, observed that pursuant to La. C.C.P. art. 1812, "the trial court is given wide discretion in determining and framing questions to be posed as special jury interrogatories, and absent some abuse of that discretion, this court will not set aside those determinations." (citing *Wiltz v. Bros. Petroleum, L.L.C.,* 2013-332, p. 20 (La. App. 5 Cir. 4/23/14), 140 So.3d 758, 773, *on reh'g* (5/21/14)).

"Where the evidence will not support a finding of comparative fault, the trial judge does not err in refusing to instruct the jury or submit a jury interrogatory on that issue." *Lege v. Union Carbide Corp.*, 2020-0252, p. 38 (La. App. 4 Cir. 4/1/21), 365 So.3d 617, 643, *as clarified on reh'g,* 2020-0252 (La. App. 4 Cir. 5/12/21), 366 So.3d 75, *writ denied*, 2021-00792 (La. 10/1/21), 324 So.3d 1054, *and writ denied,* 2021-00775 (La. 10/1/21), 324 So.3d 1059 (quoting *Wiltz v. Bros. Petroleum, L.L.C.*, 2013-0332, p. 26, 140 So.3d at 776). Moreover, "it is reversible error for a trial judge to include a

33

party on the jury interrogatory form where the record does not contain evidence of that party's legal fault." *Id.*

Defendants argue that the trial court erred in removing the comparative fault line from the jury verdict form. They claim that the jury was provided evidence of Plaintiff's awareness of the dangers of a cyclist riding on the sidewalk but failed to take precautions to avoid it. Defendants argue that by removing the comparative fault interrogatory, the trial court eliminated the jury's opportunity to consider the evidence and assess Plaintiff's fault, which constitutes reversible error.

Defendants contend that they initially proposed Jury Interrogatory No. 6, which allowed for the jury to assess Plaintiff's comparative fault in the incident. They claim that the parties discussed the comparative fault interrogatory and that Plaintiff had argued for the removal of comparative fault from the form. Defendants note that the argument is not contained in the transcript and claim that it was incorrectly designated as a "discussion off the record."

Plaintiff, however, argues that Defendants consented to the removal of comparative fault from the verdict form during the off the record discussion. She notes that there was no objection to the exclusion of comparative fault as a jury interrogatory in the record. Plaintiff also claims there is no

34

evidence at trial to support including her fault on the form. Plaintiff thus claims the trial court correctly removed comparative fault from the verdict form.

The record shows that on December 6, 2022, at the close of Plaintiff's case and the jury was dismissed, the trial court held a conference with the parties to discuss the proposed jury charges and interrogatories. The transcript provides there was an objection as to the "itemization of damages." It does not reflect an objection as to other interrogatories but indicates that a "discussion" occurred off record.

The transcript also indicates that the following day, December 7, 2022, the parties did agree to remove comparative fault from the jury *charges*. The transcript provides:

MR. M. FRISCHHERTZ [Plaintiff's counsel]:

> One other brief thing for the record, Your Honor. The parties -we agreed. Last night when we looked at the interrogatories, when we removed the comparative fault question, we left the sentence above damages instructing the jury not to take into consideration any comparative fault they assigned Plaintiff. And so, we spoke to Alice [a member of the judicial staff] and asked her just to remove that sentence.

THE COURT:

> Right. And I believe she says she did.

MR. M. FRISCHHERTZ:

Right. I just wanted to make sure it was on the record and everything was clear on that.

MR. ANGELLE [Defense counsel]:

No objection to that. Your Honor

When a party fails to timely object to the jury interrogatory form, the party waives his right to raise the objection on appeal. *Chicago Prop. Ints., L.L.C.,* 2015-0299, p. 6, 177 So.3d at 1079 (citing *Hebert v. Old Republic Ins. Co.*, 2001–0355, p. 16 (La. App. 5 Cir. 1/29/02), 807 So.2d 1114, 1127; La. C.C.P. art. 1793(C)); *see also Wilson v. Transportation Consultants, Inc.*, 2004-0334, p. 9 (La. App. 4 Cir. 3/2/05), 899 So.2d 590, 598–99 (stating that "[i]n order to appeal an allegedly defective jury interrogatory, parties must object to or demand a jury interrogatory be submitted to the jury prior to the jury retiring and that the "appealing party's failure to do so waives his right to raise this issue upon appeal"). However, "this requirement is relaxed when the jury interrogatories contain a 'plain and fundamental' error." *Id*. (quoting *Berg v. Zummo*, 2000-1699, p. 13, n.5 (La. 4/25/01), 786 So.2d 708, 716).

Here, there is no record of Defendants objecting to the removal of the comparative fault line from the verdict form.  It was incumbent on Defendants to make an objection on the record to preserve review of an error

36

on appeal. Because Defendants failed to do so, Defendants cannot raise this issue on appeal.  This assignment of error lacks merit.

**CONCLUSION**

For the foregoing reasons, the trial court's judgment adopting the jury's verdict is affirmed.

**AFFIRMED**